**KUNZLER BEAN & ADAMSON**
R. Jeremy Adamson (UT State Bar No. 12818)
Taylor Smith (UT State Bar No. 17537)
50 W Broadway, Suite 1000
Salt Lake City, Utah 84101
(801) 939-3684
jadamson@kba.law

**STRADLING YOCCA CARLSON & RAUTH**
**A PROFESSIONAL CORPORATION**
Jason de Bretteville (CA State Bar No. 195069)
jdebretteville@stradlinglaw.com
*Pro Hac Vice Application Pending*
Tucker Atkins (CA State Bar No. 343188)
tatkins@stradlinglaw.com
*Pro Hac Vice Application Pending*
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
(949) 725-4000

*Counsel for Defendant Henry "Hank" Wyatt*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MARK COMBS, VLAD IACOB, and BENJAMIN NORTHEY, Individually and On Behalf of All Others Similarly Situated, | Case No.   2:22-cv-00642-DBB-JCB |
| | Judge David Barlow |
| Plaintiffs, | Magistrate Judge Jared C. Bennett |
| vs. | |
| | **DEFENDANT HENRY "HANK" WYATT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT AND SUPPORTING MEMORANDUM** |
| SAFEMOON LLC; SAFEMOON US, LLC; SAFEMOON CONNECT, LLC; TANO LLC; SAFEMOON LTD, SAFEMOON PROTOCOL LTD; SAFEMOON MEDIA GROUP LTD; BRADEN JOHN KARONY; JACK HAINES-DAVIES; HENRY "HANK" WYATT; JAKE PAUL; KYLE NAGY; DeANDRE CORTEZ WAY; BEN PHILLIPS; MILES PARKS McCOLLUM; THOMAS SMITH; and DANIEL M. KEEM, | |
| Defendants. | |

## RELIEF SOUGHT AND GROUNDS FOR THE MOTION

Henry "Hank" Wyatt moves under Federal Rules of Civil Procedure 8(a)(2), 9(b), and 12(b)(6) to dismiss each of the causes of action alleged against him in the First Amended Complaint (the "FAC"). The FAC is neither short nor plain, and utterly fails to identify any purportedly actionable statements or conduct by Mr. Wyatt, much less with particularity, thus failing to comply with Rule 8(a)(2) and Rule 9(b). Because none of the FAC's causes of action state a claim against Mr. Wyatt upon which relief can be granted, and further amendment would be futile, we respectfully request that the Court dismiss the claims against Mr. Wyatt with prejudice under Rule 12(b)(6).

## INTRODUCTION

Plaintiffs' 184 page, 587 paragraph FAC is neither short nor plain and should be dismissed for that reason alone. Even worse, despite its heft, the FAC is all but devoid of facts pertaining to Mr. Wyatt. Worse still, to the extent that any such facts are alleged, they run contrary to any potentially viable theory of liability. According to the FAC, (i) Mr. Wyatt joined Safemoon after it started; (ii) invested his own money in Safemoon; (iii) sold some of his Safemoon holdings during a dip in Safemoon's price; (iv) never engaged with much less directed Safemoon's celebrity promoters; (v) never made any alleged misstatement or omission; and (vi) left Safemoon in September 2021. Although the FAC attempts to obscure this paucity of factual allegations by making vague, collective references to the conduct of a half dozen "Executive Defendants," its allegations against Mr. Wyatt remain plainly deficient. For these reasons, and the further reasons set forth below, the FAC's causes of action against Mr. Wyatt should be dismissed, with prejudice.

## STATEMENT OF RELEVANT ALLEGATIONS

Cryptocurrencies are "digital asset[s] designed to work as a medium of exchange or a store of value or both." (FAC (ECF 133) ¶ 31.) Perhaps the most well-known cryptocurrency, Bitcoin, started in 2009 as "the world's first decentralized crypto-asset." (*Id.* ¶ 32.) "Bitcoin spawned a market of other crypto assets," like Safemoon, "that, together with Bitcoin, have a current market capitalization of $1.3 trillion." (*Id.*) Among the many things Bitcoin popularized was the underlying blockchain technology, which allows for a "distributed ledger to track the ownership and transfer of every Bitcoin in existence." (*Id.* ¶ 33.) That blockchain technology is now "a central technical commonality across most crypto-assets." (*Id.*) The use of blockchain helps to "achieve a form of decentralization," another hallmark of the cryptocurrencies that have gained mainstream acceptance and widespread utilization as a viable alternative to traditional, government issued or "fiat" currencies. (*Id.*)

Besides being decentralized, one of the hallmarks of cryptocurrencies since their inception has been their volatility, including frequent rapid increases in value—which has paid off for many risktakers. (*See id.* ¶ 39.) For instance, "[o]ver the course of 2017 alone, Bitcoin's price increased from approximately $1,000 to approximately $20,000. On January 1, 2017, Ethereum," another popular cryptocurrency, "was trading at approximately $8 per [token]. Approximately one year later, it was trading at $1,400," equating to "a return of approximately 17,000 percent over that period." (*Id.*)

Between 2017 and 2018, "many entrepreneurs" in this new and decentralized arena started fundraising for cryptocurrency projects, typically publicizing their coin offerings through "whitepapers" in an effort to give would-be purchasers basic information about the particular

coin being offered through an "initial coin offering." (*Id.* ¶¶ 40–41.) These whitepapers "serv[e]

essentially the same purpose as a registration statement" by sharing "technical information about

[a] concept[] and a roadmap for how" a particular cryptocurrency "plans to grow and succeed."

(*Id.* ¶ 62.)

Building on these successful initial coin offerings (which raised nearly $20 billion),

"[m]ore recently, … the popularity of decentralized finance, known as 'DeFi,' has exploded."

(*Id.* ¶¶ 40, 42.) Through decentralization, cryptocurrency holders use a "financial technology

based on secure distributed ledgers …." (*Id.* ¶ 42 (internal quotation marks omitted).) A

compelling feature of decentralized finance is the use of so-called liquidity pools, "a

crowdsourced pool of cryptocurrencies or tokens locked in a smart contract that is used to

facilitate trades between the assets on a decentralized exchange." (*Id.* ¶ 43 (internal quotation

marks omitted).)

Building on the meteoric rise of cryptocurrencies including Bitcoin and Ethereum, Kyle

Nagy and others founded Safemoon[1] in early 2021. (*Id.* ¶¶ 1–2, 19, 45.) Nagy, the Safemoon

Token's lead developer, and Thomas Smith "wrote the code for the SafeMoon smart contract and

… wallet that eventually launched" their "digital asset, SAFEMOON Token." (*Id.* ¶ 49.)

The FAC does not allege that Mr. Wyatt had any role in forming or founding Safemoon.

Mr. Wyatt, who lives in Pennsylvania, allegedly joined Safemoon after "he found out about [it]

on the social media platform Discord in the early days of the Company's formation." (*Id.*

¶¶ 18, 298.) Mr. Wyatt allegedly worked as Safemoon's Chief Technology Officer and Vice

---

[1] "Safemoon" alternately refers the eponymous token or to Safemoon LLC; Safemoon US, LLC; Safemoon Connect, LLC; Tano LLC; Safemoon LTD; Safemoon Protocol LTD; and Safemoon Media Group LTD.

President of Research and Development beginning in or about February 2021, and left six

months later. (*Id.* ¶¶ 18, 297.) "[I]n the beginning" of Safemoon, Mr. Wyatt invested $9,000 of

his own money in the company. (*Id.* ¶ 298 (internal quotation marks omitted).)

 The Safemoon Token launched in early March 2021. As part of the launch, Tokens were

distributed to certain Safemoon employees. (*See id.* ¶ 57.) Like other cryptocurrencies, before the

Safemoon Token launched, Safemoon put out a whitepaper explaining both the hopes for what

Safemoon may become and the challenges that it may encounter. (*Id.* ¶¶ 63–64.) The FAC does

not allege that Mr. Wyatt had any role in the preparation or dissemination of that whitepaper.

 Beginning in early- to mid-2021, Safemoon, like many companies in the broader

financial space and elsewhere, started promoting itself on social media and, as part of that

promotional strategy, engaged endorsements from social media influencers and celebrities. (*See,*

*e.g.*, *id.* ¶¶ 87, 89, 118–27.) As part of its celebrity endorsements campaign, people with large

social media followings, like Jake Paul, "promoted SafeMoon," sometimes in conjunction with

other, unrelated, cryptocurrencies. (*Id.* ¶ 136.) Safemoon promoters like Mr. Paul, collectively

referred to in the FAC as the "Promoter" or "Promotor Defendants," were "recruited by Haines-

Davies and Phillips[.]" (*Id.* ¶ 148.) The FAC does not allege that Mr. Wyatt had any role in the

engagement of any such promoters or in the contents of any of their statements.

 During the spring of 2021, Safemoon's trading volume ebbed and flowed. (*Id.* ¶¶ 174–

75.) In this same period, a hit piece attacking Safemoon was published—in spite of the "massive

market capitalization that Safemoon ha[d] amassed." (*Id.* ¶¶ 196–97 (internal quotation marks

omitted).) After the Safemoon hit piece was published, Karony, Safemoon's CEO, refuted the

allegations on Twitter. (*Id.* ¶¶ 16, 199; *cf. id.* ¶ 201 (Shaun Witriol also "advis[ed] investors to

not sell their Safemoon Tokens ….").) And continuing through the summer of 2021, Safemoon and Karony continued heavily promoting Safemoon on social media while the Promoters also did so using their own social media accounts. (*See, e.g.*, *id.* ¶¶ 121–23.) Sometimes when Promoters would post about Safemoon, these posts—usually on Twitter—would be reposted by Karony and others in the company. (*Id.* ¶¶ 163–69.) The FAC does not allege that Mr. Wyatt made, or was involved in any aspect of making, any of these statements.

In early September 2021, Mr. Wyatt left Safemoon. (*Id.* ¶ 297.) Shortly afterwards, Mr. Wyatt was recorded mocking Safemoon's marketing and his pay. (*Id.* ¶¶ 301–02.) In a later interview, Mr. Wyatt said that his earlier remarks were made out of frustration because he "felt undervalued" by Safemoon. (*Id.* ¶ 303.) Mr. Wyatt also explained his disappointment with how his tenure at Safemoon had gone, saying that "the development team for the SafeMoon Wallet" had been "hired by the 'business leads not the developmental leads.'" (*Id.* ¶ 297.) Mr. Wyatt was also frustrated that while he and Smith were at Safemoon, they "'did not get to code'" because their job was to "'manage things' which 'didn't take that much time.'" (*Id.* ¶ 300.)

At the same time, Mr. Wyatt intimated that he had sold a "decent amount" of his Safemoon Tokens about 120 days before, which Plaintiffs estimate was in late May or early June 2021. (*Id.* ¶ 304.) As clearly shown by a chart purporting to reflect the historical "Safemoon to USD" conversion rate, if Mr. Wyatt did sell Safemoon Tokens in late May or early June 2021, his sale would have occurred during a dip in Safemoon's price that was followed by a rise a few months later. (*Id.* at ¶ 304 & ECF 133 at 94.) At this time, Mr. Wyatt's focus allegedly was elsewhere, as he, "Smith, … Church, and Nagy" were working on another, non-Safemoon, project called the "Piggy Token." (*Id.* ¶ 239.)

In explaining his plans for the "Piggy Token," Mr. Wyatt was clear that he had issues with the way that Safemoon had marketed itself and "mock[ed] the Company's marketing errors, saying 'Yeah, we don't have a dumb, fat brit doing it' this time." (*Id.* at ¶ 301; *see also id.* ¶ 302 (noting Mr. Wyatt's frustrations with Karony and Mr. Wyatt's desire for a severance from Safemoon).) The FAC goes on to speculate, without identifying any factual basis, that Mr. Wyatt's recommendation against having "a dumb, fat brit" market the "Piggy Token" "presumably" was an allusion to defendant "Phillips' hamfisted promotional activities with SafeMoon." (*Id.* ¶ 301.)

A couple months after Mr. Wyatt left Safemoon, Safemoon went through the so-called V1 to V2 migration. (*See id.* ¶¶ 338–39.) Plaintiffs allege that, during the V1 to V2 migration in December 2021, "every" V1 SAFEMOON Token was taken "from … investors." (*Id.* ¶ 338; *But see id.* ¶¶ 338–39, 342 (noting company disclosures about V1 to V2 migration).) The FAC does not allege that Mr. Wyatt had any involvement in the V1 to V2 migration.

## LEGAL STANDARDS

This Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Court "assess[es] whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted," leaving aside the "potential evidence that the parties might present at trial[.]" *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and internal quotation marks omitted). Only "well-pleaded factual allegations" are accepted as true and viewed "in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"[A] complaint must contain sufficient factual matter, accepted as true, to state a" facially

plausible "claim for relief [.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks

omitted). Additionally, because Plaintiffs' claims sound in fraud, they must satisfy Rule 9(b),

which is more rigorous, and plead each element of their claims with particularity. *Northstar*

*Alarm Serv's, LLC v. Alder Home Protection*, 2018 U.S. Dist. Lexis 126355, at *2 (D. Utah July

27, 2018). Further, before considering whether a complaint satisfies Rules 9(b) or 12(b)(6), it

must also meet Rule 8(a)(2), requiring that a complaint be "short and plain …." Fed. R. Civ. P.

8(a)(2); *see, e.g.*, *Suttman-Villars v. Argon Med. Devices, Inc.*, 553 F. Supp. 3d 946, 954–55

(D.N.M. 2021). Leave to amend should be denied when it would be futile. *See Brereton v.*

*Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).

## ARGUMENT

## I.   THE COMPLAINT FLOUTS RULE 8(A)(2) AND SHOULD BE DISMISSED

Plaintiffs' FAC spans 184 pages and 587 paragraphs. It is a "quintessential 'kitchen-sink'

or 'shotgun' complaint which brings every conceivable claim against every conceivable

defendant." *Suttman-Villars*, 553 F. Supp. 3d at 954 (internal quotation marks omitted).

"Consequently," it "violate[s]" Rule 8(a)(2), "which requires a pleading to include a short and

plain statement of the claim showing" Plaintiffs' entitlement to relief. *Id.* (citation and internal

quotation marks omitted). Plaintiffs' FAC is much longer and much less plain than other

complaints dismissed under Rule 8(a)(2), including in complex securities cases. *E.g.*, *Rusk v.*

*Fid. Brokerage Servs., LLC*, 2018 U.S. Dist. Lexis 55004, at *5–7 (D. Utah Mar. 29, 2018) (24

pages); *Moen v. Minnesota*, 2022 U.S. Dist. Lexis 239665, at *2–3 (D. Minn. Dec. 2, 2022) (92

pages, "over 300" paragraphs); *In re Buffets, Inc. Sec. Litig.*, 906 F. Supp. 1293, 1297–98 (D.

Minn. 1995) (55 pages, 129 paragraphs). As the Ninth Circuit put it in excoriating a much shorter complaint, Plaintiffs' FAC is "unwieldy in the extreme," bloated with extraneous material (*see, e.g.*, FAC ¶¶ 179–81, 211–13, n.78), and "cumbersome almost to the point of abusiveness." *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 42 F.3d 1541, 1553–54 (9th Cir. 1994) (en banc), *superseded by statute on other grounds*. The FAC should be dismissed for Plaintiffs' complete disregard for Rule 8(a)(2).

## II.   THE COMPLAINT FAILS TO STATE A CLAIM AGAINST MR. WYATT

### A.   The FDUTPA Claim Does not Allege Mr. Wyatt's Participation in any Actionable Conduct.

"The Florida Deceptive and Unfair Trade Practices Act ('FDUTPA'), Fla. Stat. § 501.201, *et seq.*, prohibits 'unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.'" *McCauliffe v. Vail Corp.*, 2021 U.S. Dist. LEXIS 198833, at *50 (D. Colo. Oct. 15, 2021) (quoting Fla. Stat. § 501.204) (brackets omitted). Against an individual defendant, "a plaintiff must allege that the individual was a 'direct participant' in the dealings" upon which liability is predicated. *In re Juul Labs., Inc., Mktg., Sales Practices & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 673 (N.D. Cal. 2020); *Visonic Sys. v. AT&T Dig. Life*, 971 F. Supp. 2d 1178, 1195 (S.D. Fla. 2013). Conclusory allegations are insufficient. *In re Juul Labs*, 497 F. Supp. 3d at 673. Further, FDUTPA claims "must be based entirely on actions that occurred within Florida." *Carnival Corp. v. Rolls-Royce PLC*, 2009 U.S. Dist. LEXIS 107261, at *18 (S.D. Fla. Nov. 17, 2009).

Plaintiffs' FDUTPA claim plainly fails, first if not foremost, because they do not allege that the underlying actions occurred in Florida. *See id.* Separately, *In re Juul Labs*' decision regarding FDUTPA's application to individual officers and directors is instructive as to Mr.

Wyatt. 497 F. Supp. 3d at 673. There, "[t]he Officer and Director Defendants argue[d] that" plaintiffs did "not allege that they personally participated in any violation of FDUTPA." *Id.* The court dismissed plaintiffs' FDUTPA claim against three individual defendants for the simple reason that plaintiffs "fail[ed] to sufficiently describe how" the individual defendants "were direct participants in the alleged misconduct." *Id.* (alteration and internal quotation marks omitted).

This accords with FDUTPA rulings in the statute's home forum, like the Southern District of Florida's decision in *Visonic Systems*. 971 F. Supp. 2d 1178, 1195. There, the court explained that "to proceed against an individual using a FDUTPA violation theory" a plaintiff "must allege that the individual was a direct participant in the improper dealings." *Id.* (internal quotation marks omitted). Consequently, in *Visonic Systems*, "[p]laintiffs' FDUTPA claims [were] unsuccessful because they state[d] only in a conclusory fashion that the individual Defendants 'participated directly in the violations,'" without "alleg[ing] how ***each individual … defendant*** actively participated in or controlled the" allegedly unlawful activity. *Id.* (emphasis added).

Plaintiffs allege that every single defendant—including Mr. Wyatt—collectively violated FDUTPA by "concealing the" Safemoon executives' "roles and ownership interests in Safemoon"; "failing to disclose that the V1 to V2 migration," which occurred after Mr. Wyatt left Safemoon, "would likely result in the total loss" of investors' tokens; and "failing to disclose that the Company was not using a mechanism to lock funds in the liquidity pools … but instead created a backdoor" for the company or executives to access the funds. (FAC ¶¶ 573(a)-(d).) As the hook for FDUTPA liability, Plaintiffs further claim that "[b]y soliciting investor funds …,

Defendants engaged in 'trade and commerce'" under FDUTPA. (*Id.* ¶ 570.)

Plaintiffs' FDUTPA claim against Mr. Wyatt also fails because FDUTPA applies only to acts "in the conduct of any trade or commerce." *McCauliffe*, 2021 U.S. Dist. LEXIS 198833, at *50 (quoting Fla. Stat. § 501.204). Plaintiffs collectively allege that the so-called Executive Defendants engaged in "trade or commerce" by "soliciting investor funds …." (FAC ¶ 570.) Glaringly absent, however, is any allegation that Mr. Wyatt personally "solicit[ed] investor funds" for Safemoon, and that is because he did not do so. (FAC ¶ 570.) Consequently, the FAC does not allege that Mr. Wyatt personally engaged "in the conduct of any trade or commerce." *McCauliffe*, 2021 U.S. Dist. LEXIS 198833, at *50.

Further, to adequately plead a FDUTPA claim against Mr. Wyatt, plaintiffs must allege how he, specifically, "actively participated in or controlled the" allegedly unlawful activity. *Visonic Sys.*, 971 F. Supp. 2d at 1195. Plaintiffs cannot rely on "conclusory allegations[.]" *In re Juul Labs*, 497 F. Supp. 3d at 673. Given that Mr. Wyatt is not alleged to have personally solicited investor funds or to have not have any "active[] participat[ion]" in or control over other defendants' solicitation of funds, Plaintiffs have plainly failed to state a FDUTPA claim. *Visonic Sys.*, 971 F. Supp. 2d at 1195.

Lastly, the FDUTPA claim against Mr. Wyatt also should be dismissed because Plaintiffs fail to meet Federal Rule of Civil Procedure 9(b)'s pleading requirements. Federal courts routinely apply Rule 9(b) to FDUTPA claims sounding in fraud. *E.g.*, *In re Ethereummax Inv. Litig.*, 2022 U.S. Dist. LEXIS 220968, at *58–59 (C.D. Cal. Dec. 6, 2022); *Smith v. Rev Grp., Inc.*, 2023 U.S. Dist. LEXIS 22396, at *10–11 (S.D. Fla. Feb. 9, 2023) (Rule 9(b) applies "to … FDUTPA claims … that sound in fraud"). Thus, "under the FDUTPA, plaintiffs must plead, with

specificity, how the alleged misrepresentations or omissions *caused* their damages." *In re Ethereummax*, 2022 U.S. Dist. LEXIS 220968, at *57–58.

As in *In re Ethereummax*, "Plaintiffs do not allege that" they "'were exposed to the same misrepresentations or any omissions, for example, through a long-term advertising campaign or where the misrepresentations or nondisclosures were included (or would have been included) on the product itself.'" *Id.*, at *58 (quoting *Justice v. Rheem Mf'g Co.*, 318 F.R.D. 687, 696–97 (S.D. Fla. 2016)). Rather, as in *In re Ethereummax*, Plaintiffs "allege that various … Defendants made or failed to make very different statements that Plaintiffs allege were misleading for vastly different reasons." *Id.*, at *58–59. Because none of those statements are attributed to Mr. Wyatt—and Plaintiffs do not even set forth which statements or publications they relied upon (if any)—the FDUTPA claim against Mr. Wyatt fails to meet Rule 9(b)'s pleading requirements. Simply put, "Plaintiffs have not plausibly alleged that" any statement by Mr. Wyatt "caused their damages …." *Id.*, at *59; *see also In re Juul Labs*, 497 F. Supp. 3d at 673.

**B.**     **The Civil RICO Claim Should be Dismissed for Lack of Standing and Predicate Offenses**

**1.**     **Plaintiffs lack RICO standing because they suffered no concrete financial loss.**

"Under RICO's civil remedies provision, … a plaintiff has standing to bring a RICO claim if he was injured in his business or property by reason of the defendant's violation of" 18 U.S.C. section 1962. *Ivar v. Elk River P'rs, LLC*, 705 F. Supp. 2d 1220, 1232 (D. Colo. 2010) (citing and quoting *Gillmor v. Thomas*, 490 F.3d 791, 797 (10th Cir. 2007) (citation and internal quotation marks omitted)). "Thus, as a basic rule, injury to business or property 'requires proof of a concrete financial loss and not merely injury to a valuable intangible property interest.'" *Id.*

(quoting *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (internal quotation marks omitted)). "Injury to mere expectancy interests or to an 'intangible property interest' is not sufficient to confer RICO standing." *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998).

Plaintiffs often fail in alleging a concrete financial loss with respect to volatile cryptocurrencies, like Safemoon, because "the most apparent reason a consumer would purchase an inherently volatile and novel cryptocurrency (*i.e.*, to effectively pay mainstream money for another, widely unaccepted, form of money) is because such a consumer hopes that one day those Tokens will be worth more than" they "paid for them. … Plaintiffs' disappointment with the fact that they did not sell their Tokens before the market plummeted was an inherent risk of the bargain." *In re Ethereummax*, 2022 U.S. Dist. LEXIS 220968, at *37–38. Thus, "Plaintiffs' 'disappointment at not winning [their] bets does not constitute an 'injury to property sufficient to confer RICO standing.'" *Id.*, at *38 (quoting *Green v. Aztar Corp.*, 2003 U.S. Dist. LEXIS 14699, at *7 (N.D. Ill. Aug. 22, 2003)). *In re Ethereummax* establishes Plaintiffs' lack of standing here.

In a complaint strikingly similar to the one here (and authored by the same plaintiffs' counsel), the *In re Ethereummax* plaintiffs alleged that various celebrities and "Executive Defendants" pumped and dumped a cryptocurrency, EthereumMax, "with price hikes often coinciding with celebrity endorsements." *Id.*, at *9–10. The defendants "argue[d] that Plaintiffs' alleged injury [was] not an injury to property as required by RICO, but rather, … merely an injury to Plaintiffs' 'expectancy interest.'" *Id.*, at *34. "[T]he essence of Plaintiffs' RICO claim [was] that the" EthereumMax "Tokens are now (months after purchasing them) worthless." *Id.*, at *36. The court agreed, as plaintiffs' "injury is nothing more than disappointment over what

their … Tokens are worth today—not what they were at the time of their purchase." *Id.*, at *38. This was "an inherent risk of the bargain" and, moreover, "based on Plaintiffs' own allegations, it appears that at least some people did sell their … Tokens for a hefty profit[.]" *Id.*, at *37–38.

Here, Plaintiffs attempt to allege damages by asserting "[b]ut for the misleading statements and omissions made by the RICO Defendants, Plaintiff and others … would have paid less for the SAFEMOON Tokens" than they actually paid. (FAC ¶ 557.) Plaintiffs go on to claim that Defendants—without saying who, exactly—"inflated the SAFEMOON Token price, which was ultimately paid for by Plaintiff and the other class members." (FAC ¶ 558.)

Plaintiffs lack RICO standing because their belief that they overpaid for their Safemoon Tokens and, consequently, were unable able to reap the benefits of paying a lower price, but for Defendants' actions, is indistinguishable from the claim that *In re Ethereummax* dismissed . (*See* FAC ¶¶ 556–58; *See* 2022 U.S. Dist. Lᴇxɪs 220968, at *37–38.)  Plaintiffs took a chance on Safemoon—that their tokens may go up in value or may decrease in value—and are disappointed in how that chance turned out for them. But this is not a concrete injury as a matter of law—it is, at most, an injury to an expectancy interest that Plaintiffs did not receive by virtue of betting their money on a novel cryptocurrency that did not perform the way that they wanted it to perform. *See id.*, at *37–38; *see also Price*, 138 F.3d at 607. Plaintiffs' claim should, consequently, be dismissed.

### 2. The PSLRA bars Plaintiffs' RICO claim predicated on mail or wire fraud.

"Congress enacted the Private Securities Litigation Reform Act of 1995" (the "PSLRA") to be "a check against abusive litigation by private parties[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Among other things, "[t]he PSLRA amended RICO to

provide that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of RICO." *Bixler v. Foster*, 596 F.3d 751, 759 (10th Cir. 2010) (alteration and quotation marks omitted); *see Bald Eagle Area Sch. Dist. v. Keystone Fin. Inc.*, 189 F.3d 321, 330 (3d Cir. 1999). Allegations of mail and wire fraud, among other things, if "'undertaken in connection with the purchase of a security … cannot support a civil RICO claim after enactment of the PSLRA.'" *Bixler*, 596 F.3d at 760 (quoting *Bald Eagle Area Sch. Dist.*, 189 F.3d at 330).

*Bixler* held that plaintiffs, who were alleging "that defendants defrauded them from receiving … stock as provided in the transaction" and a "subsequent (allegedly fraudulent) merger," lacked RICO standing because their claims arose from mail and wire fraud. *Id.* Similarly, *Bald Eagle Area School District* explained that "a plaintiff cannot avoid the RICO Amendment's bar" in the PSLRA "by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud." 189 F.3d at 330.

Plaintiffs allege Mr. Wyatt's RICO liability on mail and wire fraud in connection with the purchase of alleged securities. (*See, e.g.*, FAC ¶ 551.) Under *Bixler*, Plaintiffs' claim are barred because alleged mail or wire fraud "in connection with the purchase of a security"— what Plaintiffs allege here—"cannot support a civil RICO claim after enactment of the PSLRA." 596 F.3d at 760 (internal quotation marks omitted). Thus, even if Plaintiffs had standing, their claim would still be subject to dismissal.

## C.   The Common Law Conspiracy Claim Should be Dismissed

As a threshold matter, the FAC fails to identify the state or federal law under which the

conspiracy claim is asserted and, for that reason alone, that claim must be dismissed. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d 955, 966 (N.D. Cal. 2011).  Notably, were Plaintiffs to amend to specify either California[2] or Utah law, such amendment would be futile because the FAC's allegations do not state a claim under either jurisdiction's law.

Under Utah law, Plaintiffs must show (1) a combination of two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result thereof. *Israel Pagan Estate v. Cannon*, 746 P.2d 785, 790 (Utah Ct. App. 1987); *see id.* at 790 n.2 ("Utah has no civil conspiracy statute, … but it is well settled that such an offense exists at common law."). Crucially, "the plaintiff must sufficiently plead an underlying tort." *Hatfield v. Cottages on 78th Cmty. Ass'n*, 2022 U.S. App. LEXIS 18603, at *12–13 (10th Cir. July 6, 2022); *Celtig, LLC v. Patey*, 347 F. Supp. 3d 976, 986 (D. Utah 2018) (Parrish, J.); *Chappell v. Skywest Airlines, Inc.*, 2021 U.S. Dist. LEXIS 238285, at *5 (D. Utah Dec. 13, 2021) (Nuffer, J.) (dismissing conspiracy claim for failure to allege underlying tort).

Plaintiffs' conspiracy claim should be dismissed under Utah law for reasons recently explained by the Tenth Circuit and two judges of this District. In *Hatfield*, the Tenth Circuit affirmed the dismissal of a conspiracy claim under Utah law because the plaintiff had not "plausibly alleged an underlying tort." 2022 U.S. App. LEXIS 18603, at *34–25. Likewise, in *Celtig*, Judge Parrish dismissed a Utah conspiracy claim because plaintiffs had not adequately alleged "a meeting of the minds," and also noted that plaintiffs had to "establish that [the

---

[2] If the Court interprets Plaintiffs' claim under California law, then it should be dismissed for the reasons set forth in Safemoon and Mr. Karony's motion to dismiss, which Mr. Wyatt incorporates by reference under District of Utah Civil Rule 7-1(a)(7).

defendant] participated in an underlying tort" to state a conspiracy claim. 347 F. Supp. 3d at 986. Similarly, Judge Nuffer recently dismissed a civil conspiracy claim that was "premised on [plaintiff's] fraud claim" because the plaintiff "fail[ed] to allege sufficient facts to state a claim for fraud," and, consequently, "fail[ed] to state a claim for civil conspiracy against the" defendants. *Chappell*, 2021 U.S. Dist. LEXIS 238825, at *5.

Here, Plaintiffs assert that all Defendants are liable for conspiracy because, starting in March 2021, "the Executive Defendants" engaged "in the formation and operation of a conspiracy with the Promotor Defendants to misleadingly promote the SAFEMOON Tokens to retail investors" to "artificially inflate the price and trading volume so that" unspecified "Defendants could sell their respective SAFEMOON Tokens for substantial profits." (FAC ¶ 562; *see also id.* ¶ 563.) Notably absent from the claim is an allegation of an underlying tort— much less one against Mr. Wyatt. (*See* FAC ¶¶ 561–65.) This cause of action fails under Utah law for that reason. *Hatfield*, 2022 U.S. App. LEXIS 18603, at *34–35; *Celtig*, 347 F. Supp. 3d at 986; *Chappell*, 2021 U.S. Dist. LEXIS 238825, at *5.

Even if Plaintiffs were to claim that their thirteenth cause of action (styled as one for "unjust enrichment/restitution" under California law) constituted the underlying tort, that would be fallacious given that neither unjust enrichment nor restitution is a cause of action under California law. (*See infra*, § II.F.) Thus, the claim would fail for the same reasons found by the *Chappell* Court upon dismissal of the fraud claim in that case. 2021 U.S. Dist. LEXIS 238825, at *5. Because Plaintiffs "fail[] to sufficiently allege the tort underlying their civil conspiracy claim, [they] fail[] to state a claim for civil conspiracy against" Mr. Wyatt and the claim should be dismissed. *Id.* But even if that were not the case, Plaintiffs completely fail to allege in a non-

conclusory way a "meeting of the minds on the object or course of action" of the conspiracy. *Wenneman v. Brown*, 49 F. Supp. 2d 1283, 1291 (D. Utah 1999). Because that essential element is missing, the claim would have to be dismissed for that additional reason.

### D. The Section 10(b) and Rule 10b-5 Claims Should be Dismissed

#### 1. The "false and misleading statements" claim should be dismissed because Plaintiffs do not allege that Mr. Wyatt made any statements or omissions.

"When pleading a securities action under section 10(b), the plaintiff must allege 'what misrepresentations were made by the defendant, to whom these misrepresentations were made, when these misrepresentations were made, [and] how these misrepresentations furthered the alleged fraudulent scheme.'" *Sheldon v. Vermonty*, 31 F. Supp. 2d 1287, 1291 (D. Kan. 1998) (quoting *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir. 1992)). "In other words, the plaintiff must plead the 'who, what, when, where, and how: the first paragraph of any newspaper story.'" *Id.* (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)); *see also, e.g.*, *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 819 (N.D. Cal. 2019).

In *Sheldon*, the complaint failed Rule 9(b)'s pleading requirements for, among other reasons, plaintiff's failure "to identify to which defendant each misrepresentation is attributed; instead," just like here, "most instances of misrepresentation [were] collectively imputed to" numerous defendants. 31 F. Supp. 2d at 1292. And, as *City of Philadelphia v. Fleming Companies* explains, plaintiffs cannot adequately plead that an individual defendant had "knowledge of … materiality" simply based on the individual defendant's "senior position" at a company. 264 F.3d 1245, 1264 (10th Cir. 2001).

Here, Plaintiffs identify nearly three dozen alleged "Misrepresentations and Omissions"

made by Safemoon and certain Safemoon executives (*see* FAC ¶ 434(a)-(hh)), yet not one of

those 33 statements is attributed to Mr. Wyatt. (*See generally id.*) That is plainly insufficient to

state a claim against Mr. Wyatt, even if everything that everyone else said or omitted was false

or materially misleading (and there is no indication that it was beyond conclusions and

conjecture). It is just as insufficient as the allegations in *Sheldon*, where the district court

concluded that plaintiff's allegations, largely predicated on collective statements, was

insufficient. 31 F. Supp. 2d at 1292.

Plaintiffs flatly claim that Mr. Wyatt is somehow liable for "false and misleading

statements" based on more than 30 "Misrepresentations and Omissions" that he did not make,

based on nothing more than his brief presence at the company, and without alleging that Mr.

Wyatt had any actual knowledge of any alleged misstatement, much less some duty to correct

any such misstatement. (FAC ¶¶ 434(a)-(hh).) This is the same as alleging liability based on Mr.

Wyatt having, a purportedly "senior position[]" in Safemoon and claiming that he must be liable

by association, which Plaintiffs simply cannot do. *City of Phila.*, 264 F.3d at 1263–64.

In *City of Philadelphia*, the Tenth Circuit held that plaintiffs' allegations that certain

defendants knew of potentially damaging litigation, "the underlying business practices at issue in

that case, or the potential materiality of the lawsuit," consisted of no more than "conclusory

allegations" that because the individual defendants "occupied senior positions in the company,"

they "must have known a statement was false or misleading," which was "inadequate to

withstand Rule 9(b) scrutiny." *Id.* at 1263–64 (internal quotation marks omitted). The same is

true here. (*See* FAC ¶ 434(a)-(hh).) "[A]llegations that a securities fraud defendant, because of

his position within the company, 'must have known' a statement was false or misleading are

'precisely the types of inferences' that courts, 'on numerous occasions, have determined to be inadequate'" under Rule 9(b). *Id.* at 1264 (quoting *In re Advanta Corp. Sec's Litig.*, 180 F.3d 525, 539 (3d Cir. 1999)). In sum, "[g]eneralized imputations of knowledge" are insufficient, "regardless of" someone's "position[] within the company." *Id.*

**2.      The "scheme liability" claim does not state a cause of action against Mr. Wyatt.**

"To state a scheme liability claim, a plaintiff must show: '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.'" *Plumber & Steamfitters Local 773 Pension Fund, Bost. Ret'mt Sys. v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (quoting *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020)). "[S]cheme liability requires proof of participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance." *SEC v. St. Anselm Expl. Co.*, 936 F. Supp. 2d 1281, 1299 (D. Colo. 2013). "And, of course, the deceptive or fraudulent scheme or activity must have occurred 'in connection with the purchase or sale of a[] security.'" *Plumber & Steamfitters*, 11 F.4th at 105 (quoting 17 C.F.R. § 240.10b-5). "Because scheme claims sound in fraud, they are subject to" Rule 9(b). *Id.* Thus, "[t]o maintain a 10b-5(a) or (c) claim, a plaintiff must specify 'what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue.'" *Id.* (quoting *In re Parma Sec. Litig.*, 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005)).

In *Plumber & Steamfitters*, Plaintiffs "fail[ed] to surmount th[e] heightened pleading standard" for scheme liability claims because "[a]t no point d[id] they articulate with precision

the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it." *Id.* Instead, their claim consisted of conclusory allegations and pleading by reincorporation. *Id.* In so holding, the court explained that, "[a]bsent some sort of enumeration of which specific acts constituted an alleged scheme …, the … claim does not applicable heightened pleading standard and cannot go forward." *Id.*

Here, Plaintiffs allege that Mr. Wyatt is liable under a scheme liability theory because the Promoter Defendants' endorsements of Safemoon "caused the price and trading volume of Safemoon Tokens to increase substantially" from March through May 2021. (FAC ¶ 469.) This "pump-and-dump scheme" was accomplished, they allege in relevant part, by "the Executive Defendants 're-tweet[ing]' or otherwise broadcast[ing] the Promotor Defendants' promotions of SAFEMOON Tokens without disclosing that the Promoter Defendants had received consideration from the Company to post such promotions." (FAC ¶ 466.)[3] Thereafter, the Safemoon Token's price "decreased as the Executive Defendants and Promoter Defendants" sold their tokens. (FAC ¶ 470.)

Plaintiffs' claim vaguely alludes to actions taken by "the Executive Defendants" writ large, and alleges scienter because "they," meaning the entire lot of "the Company, the Executive Defendants, and the Promoter Defendants … necessarily knew that: (i) the Promoter Defendants received consideration for their social-media promotions of the Company and SAFEMOON Tokens; (ii) such promotions did not reflect the sincere beliefs of the Promoter Defendants; and

---

[3] It bears noting that if Mr. Wyatt tried to "pump and dump" Safemoon, then he was exceptionally bad at it. As Plaintiffs are forced to acknowledge, if their timeline for when Mr. Wyatt sold some of his Safemoon is correct, he sold well below (and after) Safemoon's height. (ECF 133 at 94.) In fact, Plaintiffs' chart alleges that Mr. Wyatt sold during a dip in Safemoon's price that was followed by a bump a few months later. (*Id.*)

(iii) they sold SAFEMOON Tokens in the period of and immediately following such promotions." (FAC ¶ 471.)

Like Plaintiffs' false and misleading statements claim, this claim lumps Mr. Wyatt together with Safemoon itself, other Safemoon executives, and Safemoon promoters without ever once directly alleging anything that *he* did or alleging what he knew. This is a bizarre, legally deficient way to allege scheme liability against Mr. Wyatt. The FAC contains no allegation that Mr. Wyatt was ever involved with or even aware of the "Promoter Defendants," on whom the scheme liability claim is entirely based. (*E.g.*, FAC ¶ 471.) Quite the opposite, the FAC admits that the promoters were "recruited by Haines-Davies and Phillips[.]" (*Id.* ¶ 148.)

The FAC also lists various allegedly misleading "promotions" by the "Promoter Defendants" and related actions taken by people other than Mr. Wyatt that they claim caused Safemoon's trading price and volume to spike; but, again, the FAC is silent about Mr. Wyatt. (*See* FAC ¶¶ 467(a)-(g).) Insofar as Plaintiffs try to make this a claim against Mr. Wyatt, their allegations fail to state any "specific acts" that he conducted, his underlying actions, or even when his purported involvement with those underlying actions arose in the first place, if it occurred at all. *Plumber & Steamfitters*, 11 F.4th at 105. Thus, at least as to Mr. Wyatt, the FAC's allegations fall far short of pleading "proof" of Mr. Wyatt's "participation" in an "inherently deceptive transaction …." *St. Anselm Expl. Co.*, 936 F. Supp. 2d at 1299. Consequently, the scheme liability claim should be dismissed.

### E.  The Exchange Act Claims Should be Dismissed

#### 1.  The claim for unregistered offering and sale of securities in violation of sections 5 and 12(a)(1) fails to state a cause of action.[4]

Plaintiffs' section 12(a)(1) claim should be dismissed because Plaintiffs have not pleaded

that Mr. Wyatt directly offered or sold them a security. 15 U.S.C. § 77l(a)(1). Only "immediate

seller[s]" are liable under section 12—meaning only someone who passes title, solicits, or urges

a buyer to purchase. *Pinter v. Dahl*, 486 U.S. 622, 642–44 & 644 n.21 (1988). Plaintiffs do not

plausibly allege that Mr. Wyatt falls under any of those categories. Additionally, Plaintiffs are

not entitled to relief on their section 12 claim because they still hold their Safemoon Tokens. *See*

ECF 42-2; *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1034 (2d Cir. 1979).

Separately, Plaintiffs' section 5 claim must be dismissed because that provision requires a

registration statement for securities in many cases, but subject to numerous exceptions including

trades by ordinary investors who are not issuers, underwriters, or dealers. 15 U.S.C. §§ 77d,

77e(a); *SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 757 (S.D.N.Y. 2018). Plaintiffs do not allege

who sold them their Safemoon Tokens, but there is no basis on which to assume that it was

Mr. Wyatt. To the contrary, given the sheer number of Safemoon Tokens being traded during the

relevant time period, and the absence of any specific allegations as to the timing of any sale by

Mr. Wyatt, it is nothing more than a wild guess for Plaintiffs to assume that it was Mr. Wyatt

who sold them their tokens, as opposed to some other investor. *See Iqbal*, 536 U.S. at 679.

#### 2.  The section 15 and 20(a) claims should be dismissed.

Plaintiffs' section 15 and 20(a) "control person" claims should be dismissed because, as

---

[4] Mr. Wyatt also incorporates by reference Karony and Safemoon's arguments for dismissal of these claims set forth in their motion to dismiss. *See* DUCivR 7-1(a)(7).

explained elsewhere, Plaintiffs fail to establish "a primary violation of the securities laws" by

Mr. Wyatt. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305  (10th Cir. 1998) (section 15);

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1107 (10th Cir. 2003) (section 20(a)).

      **F.**    **The Unjust Enrichment/Restitution Claim Should be Dismissed Because it is not a Cause of Action and, in any Event, Plaintiffs Fail to Plead an Inadequate Remedy at Law**

"[T]here is no cause of action in California for unjust enrichment." *Melchior v. New Line*

*Prod's, Inc.*, 106 Cal. App. 4th 779, 793 (2003); *Robinson v. HSBC Bank USA*, 732 F. Supp. 2d

976 (N.D. Cal. 2010) (substantially same); *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753,

762 (9th Cir. 2015) (substantially same). "Unjust enrichment is synonymous with restitution"—

which is also not a cause of action under California law. *Durell v. Sharp Healthcare*, 183 Cal.

App. 4th 1350, 1370 (2010); *accord Stevens v. Britax Child Safety, Inc.*, 2021 U.S. Dist. LEXIS

252732, at *16–17 (C.D. Cal. July 13, 2021). Moreover, to obtain equitable relief, plaintiffs must

allege that they "lack[] an adequate remedy at law[.]" *Sonner v. Premier Nutrition Corp.*, 971

F.3d 834, 844 (9th Cir. 2020); *accord In re Ethereummax*, 2022 U.S. Dist. LEXIS 220968, at *65.

      Plaintiffs' unjust enrichment/restitution claim thus should be dismissed because neither

restitution nor unjust enrichment are causes of action. *E.g.*, *Melchior*, 106 Cal. App. 4th at 793;

*Stevens*, 2021 U.S. Dist. LEXIS 25273, at *16–17. Separately, Plaintiffs' failure to allege that

they lack an adequate remedy at law (*see* FAC ¶¶ 583–85; *see generally* ECF 133 at 183–84)

provides an independent basis for dismissal. *E.g.*, *Sonner*, 971 F.3d at 844.

      **G.**    **In any Event, The Court Should not Exercise Supplemental Jurisdiction Over Plaintiffs' State Law Claims**

This Court has supplemental jurisdiction over Plaintiffs' state law claims only through

Plaintiffs' federal claims, which should be dismissed for the reasons explained elsewhere in this

motion. *See* 28 U.S.C. § 1367. However, "[if] federal claims are dismissed before trial, leaving

only issues of state law, the federal court should decline the exercise of jurisdiction" and dismiss

the case. *Bauchman v. W. High Sch.*, 143 F.3d 542, 549 (10th Cir. 1997); *see, e.g.*, *Sandberg v.

Englewood, Colo.*, 727 Fed. Appx. 950, 965 (10th Cir. 2018) ("[W]e conclude the district court

erred by exercising jurisdiction over the state law claims after it had dismissed the federal causes

of action."). Because Plaintiffs' federal claims fail to state causes of action, this Court lacks

supplemental jurisdiction over Plaintiffs' state law claims and should dismiss them. *Bauchman*,

143 F.3d at 549; *Sandberg*, 727 Fed. Appx. at 965.

## CONCLUSION

Mr. Wyatt's motion should be granted and the FAC dismissed with prejudice.


DATED this 16th day of May, 2023.

By:  _____

      R. Jeremy Adamson
      Taylor Smith
      KUNZLER BEAN & ADAMSON
      50 W Broadway, Suite 1000
      Salt Lake City, Utah 84101

      Jason de Bretteville
      Tucker Atkins
      Stradling Yocca Carlson & Rauth,
      A Professional Corporation
      660 Newport Center Drive, Suite 1600
      Newport Beach, CA 92660-6422

## <u>CERTIFICATE OF COMPLIANCE</u>

I, R. Jeremy Adamson, in accordance with DUCivR 7-1(a)(5), certify that Defendant Henry

"Hank" Wyatt's Motion to Dismiss for failure to state a cause of action under Federal Rule of Civil

Procedure 12(b)(6) and Supporting Memorandum contains 7,217 words and complies with

DUCivR 7-1(a)(4).

*/s/ R. Jeremy Adamson*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 16, 2023, I caused a true and correct copy of the foregoing document

to be served on all counsel of record via CM/ECF.

*/s/ R. Jeremy Adamson*