THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| MARK COMBS, VLAD IACOB, and BENJAMIN NORTHEY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAFEMOON LLC, SAFEMOON U.S. LLC, SAFEMOON CONNECT LLC, SAFEMOON LTD, SAFEMOON PROTOCOL LTD, SAFEMOON MEDIA GROUP LTD, TANO LLC, BRADEN JOHN KARONY, JACK HAINES-DAVIES, HENRY "HANK" WYATT, JAKE PAUL, KYLE NAGY, DEANDRE CORTEZ WAY, BEN PHILLIPS, MILES PARKS MCCOLLUM, THOMAS SMITH, and DANIEL M. KEEM,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [149] [150] [152] [156] DEFENDANTS' MOTIONS TO DISMISS**<br><br>Case No. 2:22-cv-00642-DBB-JCB<br><br>District Judge David Barlow |

On March 17, 2023, Mark Combs, Vlad Iacob, and Benjamin Northey (collectively

"Plaintiffs") filed their Amended Complaint against various SafeMoon entities,[1] Braden John

Karoney, Jack Haines-Davies, Henry "Hank" Wyatt, Jake Paul, Kyle Nagy, DeAndre Cortez

Way, Ben Phillips, Miles Parks McCollum, Thomas Smith, and Daniel M. Keem, alleging

---

[1] For purposes of this Order, "SafeMoon" refers to SafeMoon LLC, SafeMoon Connect, Tano LLC, and SafeMoon Media Group. The court received notice on January 9, 2024 that Defendant SafeMoon U.S., LLC filed for Chapter 7 bankruptcy on December 14, 2023. *See* Suggestion of Bankruptcy of Defendant SafeMoon U.S., LLC, ECF No. 189. Per 11 U.S.C. §§ 103(a), 362(a), this case was automatically stayed as to SafeMoon U.S., LLC. Therefore, although SafeMoon U.S., LLC originally joined in one of the Motions that is the subject of this decision, this decision has no effect on SafeMoon U.S., LLC.

thirteen causes of action related to Plaintiffs' purchase of a cryptocurrency.[2] Mr. Wyatt,[3] SafeMoon and Mr. Karony,[4] Mr. Nagy,[5] and Mr. Smith[6] separately move to dismiss the claims against them. For the following reasons, the court grants in part and denies in part Defendants' Motions.

## BACKGROUND

When considering a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the plaintiff's complaint.[7] Thus, the court recites the facts underlying this case according to Plaintiffs' First Amended Complaint ("Amended Complaint") and the procedural record before it.

In 2021, Mr. Nagy and Mr. Smith created the SafeMoon token—a cryptocurrency asset created via the Binance Smart Chain mainnet blockchain.[8] Mr. Nagy and Mr. Smith partnered with Mr. Karony and Mr. Haines-Davies, with the former operating as developers and the latter operating as the management and marketing team.[9] Other members were later added to the team.[10] The Amended Complaint alleges that Mr. Karony became the company's Chief Executive Officer ("CEO"), Mr. Haines-Davies acted as the Chief Operating Officer ("COO"), Mr. Wyatt was the Chief Technology Officer ("CTO"), Mr. Smith was the Chief Blockchain Officer, Mr. Church was the Community Manager, and Mr. Witriol was part of the marketing

---

[2] First Am. Compl. ("Am. Compl."), ECF No. 133.
[3] Def. Henry "Hank" Wyatt's Motion to Dismiss Plaintiffs' First Amended Complaint and Supporting Memorandum ("Wyatt Mot."), ECF No. 149.
[4] Motion to Dismiss Plaintiffs' First Amended Compl. 1 ("SafeMoon Mot."), ECF No. 150.
[5] Defendant Kyle Nagy's Motion to Dismiss First Amended Complaint ("Nagy Mot."), ECF No. 152.
[6] Defendant Thomas Smith's Motion to Dismiss Plaintiffs' First Amended Complaint ("Smith Mot."), ECF No. 156.
[7] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[8] Am. Compl. ¶¶ 45–49.
[9] *Id.* ¶ 50.
[10] *Id.* ¶¶ 51–52.

team.[11] The Complaint refers to Mr. Karony, Mr. Nagy, Mr. Smith, Mr. Haines-Davies, and Mr. Wyatt collectively as the "Executive Defendants."[12]

On March 8, 2021, SafeMoon launched the SafeMoon token.[13] According to the Amended Complaint, SafeMoon launched with 1 quadrillion tokens, which were available only on a cryptocurrency exchange known as "PancakeSwap."[14] Over time, SafeMoon tokens became available on other cryptocurrency exchanges.[15] The novelty of SafeMoon tokens, compared to other emerging cryptocurrencies, was that SafeMoon would periodically "burn" tokens to achieve greater scarcity and drive prices up.[16] Under this process, each time a SafeMoon token was traded, the transaction was assessed a 10% tax; half this was redistributed to other SafeMoon holders, and the other half was removed from circulation.[17] The half removed from circulation was to be put into "liquidity pools."[18] These liquidity pools were supposedly "locked," with no one being able to withdraw the tokens contained within.[19] This process was described in a pair of "whitepapers" released by SafeMoon upon launch.[20] The Amended Complaint, however, alleges that the liquidity pools were not in fact locked, and could be accessed by SafeMoon itself and its executives.[21] According to the Amended Complaint, as opposed to some other cryptocurrencies, SafeMoon tokens serve no real-world purpose, and SafeMoon as a company did not offer any

---

[11] *Id.* ¶ 53.
[12] *Id.* ¶ 21.
[13] *Id.* ¶ 54.
[14] *Id.* ¶¶ 55, 61.
[15] *Id.* ¶¶ 83, 91, 98, 100, 104–06, 108, 110, 113–14, 117, 119.
[16] *Id.* ¶¶ 62–76.
[17] *Id.* ¶¶ 69–71.
[18] *Id.* ¶ 70.
[19] *Id.* ¶¶ 74–75.
[20] *Id.* ¶¶ 62–76.
[21] *See id.* ¶¶ 210, 264, 299.

other tangible products or services.[22] 50% of SafeMoon tokens were owned by SafeMoon itself.[23]

After the SafeMoon token was created, the Amended Complaint alleges that Defendants engaged in a pump-and-dump scheme to promote it and sell their own tokens.[24] Namely, the Amended Complaint provides numerous examples of SafeMoon's social media posts, and posts from other named defendants, that are plainly intended to generate public interest in SafeMoon tokens.[25] Next, the Amended Complaint alleges that SafeMoon hired various celebrities and social media influencers to promote SafeMoon tokens, who did so via social media posts.[26] It alleges on "information and belief" that these Promoter Defendants—Mr. Jake Paul, Mr. DeAndre Cortez Way, Mr. Ben Phillips, Mr. Miles Parks McCollum, and Mr. Daniel Keem—received SafeMoon tokens in exchange for their promotions.[27] The Amended Complaint repeatedly alleges that these promotional efforts inflated the price of the SafeMoon token.[28]

Around five months after the launch of the SafeMoon token, SafeMoon announced the impending release of the SafeMoon Wallet.[29] However, on the date of anticipated release, SafeMoon stated that technical issues had prevented the Wallet's release.[30] The Wallet was released in the following weeks.[31] According to the Amended Complaint, repeated Wallet

---

[22] *Id.* ¶¶ 78–81.
[23] *Id.* ¶ 79.
[24] *Id.* ¶¶ 84–296, 325–42.
[25] *See, e.g.*, *id.* ¶¶ 88–127, 167, 170–73, 176, 184–86, 195–96, 199, 201–03, 205, 214, 216–17, 222–24, 238, 266–71, 275, 280–81, 285, 289, 291, 295.
[26] *See, e.g.*, *id.* ¶¶ 133–66, 168, 183, 187, 189–94, 202–03, 218–21, 242–54, 272–73, 277–78.
[27] *Id.* ¶¶ 22–27, 133; *see also id.* ¶¶ 135–42, 287,
[28] *See, e.g.*, *id.* ¶¶ 174, 194, 265, 286, 288, 290, 296, 350.
[29] *Id.* ¶¶ 285, 289.
[30] *Id.* ¶¶ 291–93.
[31] *Cf. id.* ¶¶ 286, 290, 330.

announcements drove trading volume up.[32] Following the failed Wallet launch, several

developers and executives left SafeMoon after selling off most of their tokens.[33]

     In December 2021, SafeMoon announced that it would be migrating to "V2."[34]

Essentially, a new SafeMoon token would be created, and the value of the old SafeMoon token

would be transferred over to the new one.[35] Users were directed to convert their tokens, but when

they did so, they were charged the typical 10% fee.[36] SafeMoon raised and lowered this fee

percentage over the next several days.[37] Eventually, in response to holdouts who refused to

migrate their tokens to V2, SafeMoon began charging a 100% fee on all transfers of V1

SafeMoon tokens.[38] SafeMoon publicly announced the 100% fee on its social media, but did not

make this information available on its website until January 2022.[39] Therefore, according to the

Amended Complaint, between December 12 and December 29, 2021, purchasers were unaware

of the 100% fee, and even after that, some remained unaware.[40] And those purchasers who did

attempt to transition from V1 to V2 during this time-frame had many of their tokens confiscated

by SafeMoon.[41]

     Finally, the Amended Complaint describes efforts by Mr. Karony to suggest that

SafeMoon was not merely a cryptocurrency company, but a company engaged in other, more

tangible business. For instance, Mr. Karony suggested via social media that SafeMoon "was

---

[32] *Id.* ¶¶ 290, 296.

[33] *Id.* ¶¶ 297, 304 (Wyatt); *id.* ¶¶ 306 (Haines-Davies); *id.* ¶ 310 (others).

[34] *Id.* ¶ 324.

[35] *Id.*

[36] *Id.* ¶¶ 331–32.

[37] *Id.* ¶ 333.

[38] *Id.* ¶ 338.

[39] *Id.* ¶¶ 338–39.

[40] *Id.* ¶ 340.

[41] *Id.* ¶ 343.

preparing to start a new project called 'Operation Pheonix' [sic] in the [Republic of the]

Gambia," and made several other similar posts.[42] The Amended Complaint then alleges, based

on information and belief, supported by details of a lawsuit between Mr. Karony and his mother,

that this purported partnership was a ruse to deceive investors.[43] In a similar vein, Mr. Karony

posted on social media that "SafeMoon is NOT a token project. We are a tech company, [sic]

that uses SafeMoon as the connecting agent in our ecosystem."[44]

On February 17, 2022, this case was filed in the Central District of California,[45] and on

October 5, the case was transferred to the District of Utah pursuant to a stipulation.[46] On March

17, 2023, Plaintiffs filed the instant Amended Complaint, which alleges the following claims: (1)

SafeMoon and the Executive Defendants violated Section 10(b) of the Exchange Act; (2)

SafeMoon, the Executive Defendants, and the Promoter Defendants violated Section 10(b) of the

Exchange Act by engaging in a scheme; (3) all defendants violated Section 12(a)(1) of the

Securities Act; (4) the Executive Defendants violated Section 15 of the Securities Act; (5) the

Executive Defendants violated Section 20(a) of the Exchange Act; (6) the Promoter Defendants

aided and abetted the commission of an intentional tort, in violation of California law; (7)

Promoter Defendants aided and abetted the commission of an intentional tort, in violation of

Utah law; (8) SafeMoon and Mr. Karony committed conversion, in violation of California law;

(9) SafeMoon and Mr. Karony committed conversion, in violation of Utah law; (10) Executive

Defendants and Mr. Paul, Mr. Phillips, and Mr. Keem violated RICO; (11) all defendants

---

[42] *Id.* ¶¶ 222–24.
[43] *Id.* ¶¶ 225–38.
[44] *Id.* ¶ 314.
[45] Class Action Compl., ECF No. 1.
[46] Order on Stipulation Re: Venue Transfer, ECF No. 75.

engaged in a civil conspiracy; (12) all defendants violated Florida's Deceptive and Unfair Trade

Practices Act ("FDUTPA"); and (13) all defendants were unjustly enriched, in violation of

California law.[47]

On April 24 and May 10, 2023, respectively, the court granted the parties' joint motion to

stay all deadlines as to Mr. Paul[48] and Mr. Keem.[49] Following these orders, several remaining

Defendants separately moved to dismiss the claims alleged in the Amended Complaint.[50]

Plaintiffs filed oppositions to each of these motions in mid-July,[51] and by September 7, 2023, all

moving defendants had filed their reply briefs.[52] The court ordered additional briefing on conflict

of laws,[53] which was completed on November 28, 2023.[54]

---

[47] Am. Compl. ¶¶ 425–587.

[48] Order Granting Joint Motion to Stay Case Deadlines as to Defendant Jake Paul, ECF No. 144.

[49] Order Granting Joint Motion to Stay Case Deadlines as to Defendant Daniel M. Keem, ECF No. 148.

[50] *See supra* notes 3–6.

[51] *See* Pls.' Opp'n to SafeMoon Defs.' Mot. to Dismiss ("Pls.' SafeMoon Opp'n"), ECF No. 165; Pls.' Opp'n to Def. Henry Wyatt's Mot. to Dismiss ("Pls.' Wyatt Opp'n"), ECF No. 166; Pls.' Opp'n to Def. Kyle Nagy's Mot. to Dismiss ("Pls.' Nagy Opp'n"), ECF No. 167; Pls.' Opp'n to Def. Thomas Smith's Mot. to Dismiss ("Pls.' Smith Opp'n"), ECF No. 168.

[52] *See* Def. Henry "Hank" Wyatt's Reply in Supp. of His Mot. to Dismiss Pls.' First Am. Compl. ("Wyatt Reply"), ECF No. 170; Reply Brief in Supp. of the SafeMoon Defs.' Mot. to Dismiss Pls.' First Am. Compl. ("SafeMoon Reply"), ECF No. 171; Reply in Supp. of Def. Kyle Nagy's Mot. to Dismiss ("Nagy Reply"), ECF No. 173; Def. Thomas Smith's Reply in Supp. of Mot. to Dismiss Pls.' First Am. Compl. ("Smith Reply"), ECF No. 175.

[53] *See* ECF No. 176.

[54] *See* Lead Pls.' Brief in Resp. to Court Order ("Pls.' COL"), ECF No. 177; Brief Regarding Choice of Law ("SafeMoon COL"), ECF No. 178; Kyle Nagy's Brief on Conflict of Laws Analysis ("Nagy COL"), ECF No. 179; Def. Henry "Hank" Wyatt's Conflict of Law Analysis in Supp. Of His Mot. to Dismiss Pls.' First Am. Compl. ("Wyatt COL"), ECF No. 180; Def. Thomas Smith's Conflict of Law Analysis in Support of His Mot. to Dismiss Pls.' First Am. Compl. ("Smith COL"), ECF No. 181; SafeMoon Defs.' Resp. to Pl.'s Brief Regarding Choice of Law ("SafeMoon COL Resp."), ECF No. 182; Kyle Nagy's Resp. to Pls.' Conflict of Laws Analysis ("Nagy COL Resp."), ECF No. 183; Lead Pls.' Reply Brief in Resp. to Court Order ("Pls.' COL Resp."), ECF No. 184; Def. Henry "Hank" Wyatt's Resp. to the Conflict of Law Analyses Filed re Defs.' Mots. To Dismiss Pls.' First Am. Compl., ("Wyatt COL Resp."), ECF No. 185; Def. Thomas Smith's Resp. to the Conflict of Law Analyses Filed Regarding Defs.' Mots. To Dismiss Pls.' First Am. Compl. ("Smith COL Resp."), ECF No. 186.

## STANDARD

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[55] A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[56]

In addition, under Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[57] Rule 9(b) applies to all claims that are "based on the same core allegations of deception, false misrepresentations, and fraudulent conduct."[58] To satisfy Rule 9(b)'s heightened pleading standard, among other things, a pleading must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof."[59]

Finally, the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes heightened pleading requirements on private actions alleging false or misleading statements in connection with the sale of securities.[60] In such cases, "the complaint shall specify each statement alleged to have been misleading, [and] the reasons why the statement is misleading."[61] In addition, where recovery is conditioned on proof of a particular state of mind, "the complaint

---

[55] *Iqbal*, 556 U.S. at 679 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[56] *Id.*

[57] Fed. R. Civ. P. 9(b).

[58] *Security Sys., Inc. v. Alder Holdings, LLC*, 421 F.Supp.3d 1186, 1194 (D. Utah 2019); *see also Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.' This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action.").

[59] *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 12152 (10th Cir. 1997) (quoting *Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir. 1991)).

[60] 15 U.S.C. § 78u-4(b).

[61] *Id.* § 78u-4(b)(1).

shall, with respect to each act or omission alleged to violate [the securities laws], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[62]

## DISCUSSION

Defendants collectively raise a number of arguments in support of their motions. No Defendant challenges that the SafeMoon token is a security, at least for purposes of their Motions to Dismiss.[63] Therefore, for the purposes of this decision, the court will assume that the SafeMoon token is a security.

### I.      Rule 8(a)

At the outset, Mr. Wyatt argues that Plaintiffs' Amended Complaint violates Rule 8(a) of the Federal Rules of Civil Procedure since it "spans 184 pages and 587 paragraphs."[64] Rule 8(a) sets out that "[a] pleading that states a claim for relief must contain . . .  a short and plain statement of the claim showing that the pleader is entitled to relief."[65] The purpose of Rule 8 is to "give the defendant fair notice of what the claim is and the grounds upon which it rests."[66] "[A] failure to satisfy Rule 8 can supply a basis for dismissal" through Rule 41(b), which "specifically authorizes a district court to dismiss an action for failing to comply with any aspect of the Federal Rules of Civil Procedure."[67] However, "[w]hile the length of a complaint can be problematic, length alone does not support dismissing a complaint with prejudice under Rule

---

[62] *Id.* § 78u-4(b)(2)(A).
[63] *Cf.* SafeMoon Mot. 6 n.4; Nagy Mot. 7 n.5. *But see* Nagy Mot. 14 n.10 (asserting the SafeMoon token is not a security, but at the same time arguing that the court should not reach the issue).
[64] Wyatt Motion 8; *see also* Smith Mot. 6 n.4 (incorporating Mr. Wyatt's argument by reference).
[65] Fed. R. Civ. P. 8(a)(2).
[66] *Twombly*, 550 U.S. at 555 (cleaned up) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).
[67] *Nasious v. Two Unknown B.I.C.E. Agents, at Arapahoe County Justice Center*, 492 F.3d 1158, 1161 (10th Cir. 2007).

8."[68] Indeed, the length and complexity of a pleading are inextricably tied to the complexity of the case: "The pleadings in a case involving a single plaintiff, a single defendant, and one transaction usually will be much shorter and simpler than the pleadings in a case involving several plaintiffs, numerous defendants, and more than one transaction."[69]

Several Tenth Circuit cases are illustrative of the fact patterns that may, or may not, give rise to dismissal for failure to comply with Rule 8. In *Mann v. Boatright*, the Tenth Circuit critiqued a 99-page, single spaced pleading, that was factually scattered, and which "eschewed the traditional pleading style characterized by a short recitation of facts followed by claims for relief" and instead listed only one claim for relief that spanned 463 paragraphs and 83 pages without identifying "a concrete legal theory."[70] Conversely, in *In re Roberts*, the Tenth Circuit reversed a dismissal with prejudice of a 77 page, 213 paragraph, complaint.[71] It reasoned that the lower court did not find that the complaint at issue was unintelligible, and while the complaint was "long" and contained "repetitious and irrelevant matter," it "also contain[ed] a core of proper pleading where it sets out the claims for relief that give defendants fair notice of the claims against them."[72]

The Amended Complaint here is more similar to the complaint in *In re Roberts* than it is to the complaint in *Mann*. While it is very long—spanning 186 pages and 587 numbered

---

[68] *In re Roberts*, No. 20-3182, 2021 WL 4438744, at *3 (10th Cir. Sept. 28, 2021). In order for a district court to dismiss an action with prejudice under Rule 41(b), it must consider the factors set forth in *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992). *See Nasious*, 492 F.3d at 1162. These factors are: "(1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions." *Id.* (quoting *Olsen v. Mapes*, 333 F.3d 1199, 1204 (10th Cir. 2003)) (citing *Ehrenhaus*, 965 F.2d at 921).

[69] 5 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1217 (4th ed., April 2023 Update).

[70] 477 F.3d 1140, 1148 (10th Cir. 2007).

[71] *Roberts*, 2021 WL 4438744, at *2.

[72] *Id.* at *3.

paragraphs[73]—and at times is repetitious, it is far from unintelligible. Unlike the complaint at issue in *Mann*, the Amended Complaint serves the fundamental purpose of pleading—to apprise the defendants of what the claims against them are and to set forth the factual grounds upon which those claims rest.[74] The complaint in *Mann* listed one claim, was itself lengthy, and failed to identify concrete legal theories for the claim.[75] By contrast, the Amended Complaint here identifies thirteen claims and sets forth the facts supporting each claim.[76] In addition, the Amended Complaint purports to be a class action against numerous defendants and alleges complex factual and legal matters.

Even if the court held otherwise—that the Amended Complaint here ran afoul of Rule 8(a) given its length and complexity—it would still not dismiss the Amended Complaint with prejudice. Rather, as illustrated by the cases cited by Mr. Wyatt in support of his Motion, the proper procedure would be to dismiss without prejudice and permit Plaintiffs to seek leave to amend their pleading.[77] The court declines to do so here because, given the complexity of the claims involved here, it likely would result in only marginal improvements as to length and clarity.

---

[73] *See* Am. Compl.

[74] *See Twombly*, 550 U.S. at 555.

[75] *Mann*, 477 F.3d at 1148; *see also* Wright & Miller, *supra* note 69, at § 1217 ("[I]t should be noted that Rule 8(a)(2) speaks of a short and plain statement of each *claim*, not a short and plain *pleading*." (emphases added)).

[76] *See* Am. Compl. at ¶¶ 425–587.

[77] *See Rusk v. Fidelity Brokerage Servs., LLC*, No. 2:15-cv-00853-JNP, 2018 WL 1620969, at *3 (D. Utah, Mar. 30, 2018) (affirming dismissal with prejudice under Rule 8(a)(2) only after the plaintiff was given two previous opportunities to amend his complaint to comply with Rule 8(a)(2)); *Moen v. Minnesota*, No. 11-cv-2906 (ADM/TNL), 2022 WL 18959608, at *1 (D. Minn. Dec. 2, 2022) (affirming dismissal only after the plaintiff was warned of non-compliance with Rule 8(a)(2) and was given an opportunity to amend the complaint); *In re Buffets, Inc. Securities Litig.*, 906 F.Supp. 1293, 1294 (D. Minn. 1995) (ordering dismissal without prejudice for failure to comply with Rule 8, and giving leave to file an amended complaint). *In re GlenFed, Inc. Securities Litig.*, is inapposite, as it dealt with dismissal under Rule 9(b), not Rule 8(a). *See* 42 F.3d 1541, 1545–54 (9th Cir. 1994).

## II.      Extraterritoriality of Exchange Act Claims and Securities Act Claims

SafeMoon and Mr. Karony argue that each of Plaintiffs' claims based in the securities laws fail because Plaintiffs do not allege that they purchased "a security listed on an American Stock exchange," or that they purchased a "security in the United States."[78]

The Supreme Court, in *Morrison v. National Australia Bank*, held that Section 10(b) of the Exchange Act reaches only "the use of a manipulative or deceptive device or contrivance . . . in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."[79] There, the National Australia Bank sold stock on the Australia Stock Exchange Limited, but not on any exchange in the United States.[80] The plaintiffs were all residents of Australia who purchased National's stock.[81] The Court held that Section 10(b) could not reach the conduct complained of—alleged deceptive write-downs of one of National's subsidiaries' value[82]—since Section 10(b) did not apply extraterritorially.[83] Accordingly, the Court dismissed the claims under Rule 12(b)(6).[84] The *Morrison* Court also noted in dicta that the Securities Act likewise applies domestically.[85]

The *Morrison* Court did not clarify a test for when the purchase or sale of a security occurs within the United States, and the Tenth Circuit has not addressed the issue. The Second

---

[78] SafeMoon Mot. 6 (quoting *Morrison v. Nat'l Australian Bank*, 561 U.S. 247, 273 (2010)); *see also* Nagy Mot. 15 n.11 (incorporating SafeMoon's Motion by reference); Smith Mot. 6 n.4 (same).

[79] *Morrison*, 561 U.S. at 273.

[80] *Id.* at 251.

[81] *Id.* at 252.

[82] *Id.*

[83] *Id.* at 261–65, 273.

[84] *Id.* at 254, 273.

[85] *Id.* at 268–69. Notably, while Congress amended both the Exchange Act and the Securities Act soon after *Morrison* to provide for extraterritorial reach of the anti-fraud provisions of both Acts when it comes to actions initiated by the SEC or the United States, *see SEC v. Scoville*, 913 F.3d 1204, 1215–19 (10th Cir. 2019) (discussing 15 U.S.C. § 77v(c) and 15 U.S.C. § 78aa(b)), Congress has not modified the extraterritorial effect of the Acts when it comes to private civil suits.

Circuit, however, has held that "to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange, . . . a plaintiff must allege facts [leading to the plausible inference] that irrevocable liability was incurred or title was transferred within the United States."[86] "Irrevocable liability" refers to the time at which the purchaser was bound to "take and pay for a security" and the time at which the seller was bound "to deliver a security."[87] This court, applying the Second Circuit's test, has previously held that all transactions by a Utah LLC that sold securities through its website to both foreign and domestic purchasers took place within the United States.[88]

The question remains whether for purposes of Rule 12(b)(6) a plaintiff must affirmatively plead that transactions were domestic. The court does not read *Morrison* to suggest that all plaintiffs alleging claims grounded in the securities statutes must specifically allege where they were located when they effectuated a given transaction. Instead, *Morrison* suggests that dismissal is proper where, as was the case there, the plaintiff pleads facts that suggest that nothing about the transaction is domestic—that is, the security purchased was listed on a foreign exchange, and the purchase and sale took place outside the United States.[89] In that way, *Morrison* suggests that territoriality is closer to an affirmative defense, not a pleading requirement.[90]

---

[86] *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012).

[87] *Id.* at 68.

[88] *SEC v. Traffic Monsoon, LLC.*, 245 F.Supp.3d 1275, 1295 (D. Utah 2017).

[89] *Morrison* does not mention the standard Rule 12(b)(6) analysis, and instead takes as fact that the transaction occurred entirely in Australia.

[90] *See Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (1965) ("[A] defendant may raise an affirmative defense by a motion to dismiss for failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule. But, if the affirmative defense is based upon matters outside the complaint, and is raised by a motion under Rule 12(b), then the court must consider the motion as one for summary judgment under Rule 5 in order to consider evidentiary matters outside the complaint."); *accord Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) ("[O]n occasion it is proper to dismiss a claim on the pleadings based on an affirmative defense. But that is only when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements.").

This conclusion is reinforced by two post-*Morrison* opinions by the Supreme Court: *Kiobel v. Toyal Dutch Petroleum Co.*[91] and *RJR Nabisco, Inc. v. European Community*.[92] In both cases, the Supreme Court affirmed dismissal of a complaint where it relied exclusively on alleged conduct taking place outside the United States, and the relevant statutes did not apply extraterritorially.[93] In *RJR Nabisco*, the Court even noted that "[A] civil RICO plaintiff [is required] to allege and prove a domestic injury to business or property . . . . The application of this rule in any given case will not always be self-evident, as disputes may arise as to whether a particular alleged injury is 'foreign or domestic.' But we need not concern ourselves with that question in this case," because the plaintiffs had stipulated to a waiver of a claim for domestic injuries.[94]

Here, Plaintiffs do not allege that SafeMoon tokens were not listed on an American stock exchange, nor do they specifically allege that they did not purchase their SafeMoon tokens within the United States. Accordingly, if extraterritoriality is an affirmative defense, because the Amended Complaint does not allege its elements, dismissal is improper. And even if territoriality is more akin to an element, the court concludes that Plaintiffs adequately allege domestic transactions within the scope of Section 10(b)'s prohibition. The Amended Complaint alleges that each of the named plaintiffs resides in the United States,[95] that many of the SafeMoon

---

[91] 569 U.S. 108 (2013).
[92] 579 U.S. 325 (2016).
[93] *See Kiobel*, 569 U.S. at 124–25 (concluding that the Alien Tort Statute did not apply extraterritorially and affirming dismissal of the complaint); Am. Class Action Compl., *Kiobel v. Royal Dutch Co.*, No. 02 CV 7618 (KMW), 2004 WL 7081121, ¶¶ 28–80 (S.D.N.Y. May 14, 2004) (affirmatively alleging wrongful conduct in Nigeria); *RJR Nabisco*, 579 U.S. at 346–54 (concluding that RICO's private action provision did not apply extraterritorially and affirming dismissal of the complaint where the parties filed a stipulation waiving damages claims for domestic injuries).
[94] *RJR Nabisco*, 579 U.S. at 354.
[95] Am. Compl. ¶¶ 6–8.

entities are headquartered in the United States,[96] and that Mr. Karony resides in the United States

and directed the sale of SafeMoon tokens.[97] The Amended Complaint then alleges that

SafeMoon and the Executive Defendants sold SafeMoon tokens through various cryptocurrency

exchanges,[98] though the location of those cryptocurrency exchanges is unspecified in the

Amended Complaint. At least where, as here, a pleading alleges that the entity originating the

sales of securities is located within the United States, the sale is made to U.S. residents via the

internet, and there is no indication that the sale was consummated elsewhere, that complaint has

plausibly alleged that liability was incurred or title was transferred within the United States.

### III.   Misrepresentations Under Exchange Act Section 10(b)

Plaintiffs' first claim is based on Section 10(b) of the Exchange Act and its implementing

regulations.[99] Section 10(b) states that "[i]t shall be unlawful for any person" "[t]o use or

employ, in connection with the purchase or sale of any security registered on a national securities

exchange or any security not so registered . . . any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the Commission may prescribe

. . . ."[100] The SEC has promulgated Rule 10b-5(b) to implement Section 10(b), which makes it

unlawful for any person, "in connection with the purchase or sale of any security," to: "make any

untrue statement of a material fact or to omit to state a material fact necessary in order to make

the statements made, in light of the circumstances under which they were made, not

---

[96] *Id.* at ¶¶ 9–12.
[97] *Id.* at ¶ 16.
[98] *See id.* at ¶¶ 61, 83, 90, 91, 98, 100, 105, 108, 117, 119.
[99] *Id.* ¶¶ 425–56.
[100] 15 U.S.C. § 78j.

misleading."[101] The Supreme Court has recognized an implied private right of action under Section 10(b) and Rule 10b-5(b).[102]

> The elements of a private securities fraud claim based on violations of [Section] 10(b) and Rule 10b–5(b) are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.[103]

Since Rule 10b-5 is a claim for securities fraud, the heightened pleading standards of both Federal Rule of Civil Procedure 9(b) and the PSLRA apply to certain elements of this claim.[104] Defendants collectively challenge whether Plaintiffs adequately alleged the first, second, fourth, and sixth elements.[105]

### A.  Ultimate Authority for Alleged Misrepresentations

Rule 10b-5(b) restricts liability to those who "make" an untrue statement or who fail to correct a misleading statement.[106] In *Janus Capital Group v. First Derivative Traders*, the Supreme Court held that in order to "make" a statement, one must have "ultimate authority over the statement, including its content and whether and how to communicate it."[107] There, several related entities—Janus Capital Group and Janus Capital Management—were sued under Rule 10b-5(b) for misleading information in the prospectuses of Janus's mutual funds (which were organized in a business trust, known as the Janus Investment Fund).[108] The court held that Janus

---

[101] 17 C.F.R. § 240.10b-5(b).
[102] *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 (1971).
[103] *Hogan v. Pilgrim's Pride Corp.*, 73 F4th 1150, 1153 (10th Cir. 2023) (quoting *Erica P. John Fund., Inc. v. Halliburton Co.*, 563 U.S. 804, 809–10 (2011)).
[104] *See supra* notes 57–62; *see Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 94 (2d Cir. 2018) (applying both Rule 9(b) and the PSLRA to a Section 10(b) claim).
[105] Wyatt Mot. 18–20; SafeMoon Mot. 7–9, 13–19; Nagy Mot. 7–8, 10–12; Smith Mot. 6–7.
[106] 17 C.F.R. § 240.10b-5(b).
[107] *Janus Capital Grp. v. First Derivative Traders*, 564 U.S. 135, 143 (2011).
[108] *Id.* at 139–40.

Capital Management did not have ultimate authority over the information in the allegedly misleading prospectuses because Janus Capital Management did not have the statutory obligation to file the prospectuses, did not actually file the prospectuses, and there was nothing to indicate that the statements in the prospectuses came from Janus Capital Management.[109] That Janus Capital Management was "significantly involved in preparing the prospectuses" was insufficient.[110] The Court emphasized that a speechwriter would not be liable as a "maker" of a statement under Rule 10b-5(b), while the actual speaker would.[111] Mr. Wyatt, Mr. Nagy, and Mr. Smith argue that they did not have ultimate authority over any alleged misrepresentation.[112] The court addresses the specific arguments in turn.

### i. Mr. Wyatt

In their Opposition, Plaintiffs argue that Mr. Wyatt was responsible for the false or misleading statements appearing on SafeMoon's social media.[113] The Amended Complaint alleges that Mr. Wyatt was SafeMoon's Chief Technology Officer and Vice President of Research and Development until September 9, 2021.[114] Indeed, the Amended Complaint alleges that Mr. Wyatt publicly said he had access to and ownership of SafeMoon's social media accounts,[115] and it alleges that numerous statements on SafeMoon's social media were false or misleading.[116] However, those allegations alone are insufficient to establish Rule 10b-5(b) liability for Mr. Wyatt.

---

[109] *Id.* at 147.
[110] *Id.*
[111] *Id.* at 143, 148.
[112] Wyatt Mot. 18–20; Nagy Mot. 7–8; Smith Mot. 6–7.
[113] Opp'n to Wyatt 11–12.
[114] Am. Compl. ¶¶ 18, 297.
[115] *Id.* ¶ 302.
[116] *See* Am. Compl. ¶ 434(b), (d), (e), (i), (k), (l), (p), (r), (s), (w), (bb).

While there is authority suggesting that a company may be liable for misleading content on its officers' social media,[117] the rule Plaintiffs would have the court adopt is the inverse: that anyone with access to a company's social media is liable for any misleading content on that social media. Such a rule would contravene *Janus*'s example of the speechwriter and speaker and potentially would subject every employee responsible for crafting social media posts to liability under federal securities law, even absent proof that that individual crafted the particular statement at issue. According to the Amended Complaint, SafeMoon was the "maker" of statements appearing on its social media feeds, not Mr. Wyatt. Thus, the Amended Complaint fails to state a Rule 10b-5(b) claim against Mr. Wyatt.

### ii. Mr. Nagy

Plaintiffs argue that Mr. Nagy had ultimate authority over statements made in SafeMoon's whitepapers.[118] There is nothing in the Amended Complaint that would suggest this was the case. The Amended Complaint alleges that Mr. Nagy was a founder of SafeMoon and a lead developer on the token.[119] It then alleges that Mr. Nagy and Mr. Smith "wrote the code for the SafeMoon smart contract."[120] But while the Amended Complaint discusses the SafeMoon whitepapers in great detail,[121] nowhere does it suggest that Mr. Nagy was an author of those whitepapers. And even if Mr. Nagy were an author of the whitepapers, *Janus* held that involvement in the preparation of similar documents was insufficient for purposes of alleging

---

[117] *See, e.g.*, *In re Tesla, Inc. Sec. Litig.*, 477 F.Supp.3d 903, 926–27 (N.D. Cal. 2020); *see also In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476–79 (9th Cir. 2015).
[118] Pls.' Nagy Opp'n 7.
[119] Am. Compl. ¶ 19.
[120] *Id.* ¶ 49.
[121] *Id.* ¶¶ 62–74, 131, 328.

ultimate authority over the statements contained in the documents.[122] Thus, this argument does not advance Plaintiffs' position.

However, Plaintiffs also argue that Mr. Nagy was the "maker" of statements regarding the possibility of a "rug pull."[123] Indeed, the Amended Complaint alleges that Mr. Nagy posted that "no rug is possible. #safemoon join us on our journey safely to the moon."[124] According to the Amended Complaint, Mr. Nagy plainly had ultimate authority over this statement. Thus, dismissal of Plaintiffs' Rule 10b-5(b) claim against Mr. Nagy is not proper on this ground.

### iii.  Mr. Smith

Plaintiffs argue that Mr. Smith also had ultimate authority over the content of the SafeMoon whitepapers.[125] According to the Amended Complaint, Mr. Smith served as SafeMoon's Chief Blockchain Officer and as a lead developer of the SafeMoon token.[126] But as with Mr. Nagy, there is nothing in the Amended Complaint linking Mr. Smith to the whitepapers. And regardless, *Janus* suggests Mr. Nagy would have no Rule 10b-5(b) liability for the contents of the whitepapers. Thus, like Mr. Nagy, Mr. Smith is not alleged to have had ultimate authority over the statements contained in the whitepapers.

However, Plaintiffs also argue that Mr. Smith adopted false statements by Promoter Defendants by republishing them, and that Mr. Smith made false statements by implying an association with Elon Musk.[127] The Amended Complaint does indeed allege that Smith reposted

---

[122] *Janus*, 564 U.S. at 147–48.
[123] Pls.' Nagy Opp'n 7.
[124] *See* Am. Compl. ¶ 49.
[125] Pls.' Smith Opp'n 9–11.
[126] Am. Compl. ¶¶ 20, 49.
[127] Pls.' Smith Opp'n 9–11.

posts from the Promoter Defendants.[128] However, it does not allege that Mr. Smith made any

false statements regarding Elon Musk; instead, the Amended Complaint alleges that Mr. Karony

made this connection.[129] Without more, Mr. Karony's statement cannot provide a basis for Mr.

Smith's liability under Rule 10b-5(b). Therefore, the Amended Complaint properly alleges only

that Mr. Smith has ultimate authority for statements he adopted by reposting them.

### B. Misrepresentations

Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all

material information. Disclosure is required under these provisions only when necessary 'to

make . . . statements made, in light of the circumstances under which they were made, not

misleading.'"[130] The PSLRA requires that a pleading "specify each statement alleged to have

been misleading [and] the reasons why the statement was misleading."[131] A statement is

misleading if "additional material information was necessary at the time to make a statement

reflect the true state of affairs."[132] Information is material if "a reasonable investor would

consider it important in determining whether to buy or sell stock."[133] Materiality is "a mixed

fact-law question usually reserved for the trier of fact," except when "the alleged misstatements

are plainly immaterial."[134] However, "[s]tatements classified as 'corporate optimism' or 'mere

puffing' are typically forward-looking statements, or are generalized statements of optimism that

are not capable of objective verification. Vague, optimistic statements are not actionable because

---

[128] *See* Am. Compl. ¶¶ 157, 160–61, 165.
[129] *Id.* ¶ 276; *see also id.* ¶ 434(aa).
[130] *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).
[131] 15 U.S.C. § 78u-4(b)(1).
[132] *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1201 (10th Cir. 2013).
[133] *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997); *accord Slater*, 719 F.3d at 1197.
[134] *Slater*, 719 F.3d at 1197.

reasonable investors do not rely on them in making investment decisions."[135] Finally, "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information"; disclosure is required only to the extent necessary to make a statement not misleading.[136] Mr. Nagy, Mr. Karony, and SafeMoon argue that the Amended Complaint did not adequately allege material misrepresentations.[137]

### i.  Mr. Nagy

The only statement the Amended Complaint alleges that Mr. Nagy had authority over was his statement that "no rug is possible."[138] Per the PSLRA, the operative complaint must "specify *each* statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."[139] Mr. Nagy argues that Plaintiffs did not adequately allege that this statement was false or misleading.[140] Mr. Nagy raises this argument only on reply, and therefore, the court need not address it.[141] In any event, while the Amended Complaint does not specifically outline why Mr. Nagy's statement itself was misleading, it does contain two other sub-paragraphs alleging that substantively identical statements made by SafeMoon and Mr. Witriol regarding the possibility or fact of a "rug pull" were misleading and specifying why these statements were misleading.[142] The court concludes that this is sufficient to satisfy the PSLRA.

---

[135] *Grossman*, 120 F.3d at 111; *accord Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018).
[136] *Siracusano*, 563 U.S. at 44.
[137] SafeMoon Mot. 13–17; Nagy Reply 3.
[138] Am. Compl. ¶ 49.
[139] 15 U.S.C. § 78b-4(b)(1) (emphasis added).
[140] Nagy Reply 3.
[141] *See, e.g.*, *Mint Solar, LLC v. Savage*, No. 2:18-cv-569-PMW, 2018 WL 5924410, at *3–5 (D. Utah Nov. 13, 2018) (declining to consider several arguments raised for the first time on reply).
[142] Am. Compl. ¶¶ 434(w), (x); *compare id.* ¶ 49 *with id.* ¶¶ 261, 268.

### ii.  SafeMoon and Mr. Karony

The Amended Complaint alleges numerous statements attributed to SafeMoon and Mr. Karony. First, it alleges that the whitepapers state that tokens being channeled to the liquidity pools would be locked there for four years.[143] This information was material since the supposed allure of the SafeMoon token was that there would be a continuously shrinking supply due to the tokens being channeled to liquidity pools as a result of each transaction.[144] Further, the statements in the whitepapers were misleading, the Amended Complaint alleges, because the liquidity pools were in fact not "locked," but could be accessed by executives at SafeMoon.[145]

Second, the Amended Complaint alleges that SafeMoon and Mr. Karony made statements regarding the amount of tokens "burnt."[146] While the amount of tokens "burnt" was likely material information, the Amended Complaint does not allege these statements were misleading. Plaintiffs do not allege that these statements misrepresented the quantity of tokens "burnt"; rather, they allege that these statements were misleading because they implied that the value of the token would increase over time and did not disclose the "burning" protocols. The Amended Complaint does not plausibly allege that this was misleading.

Third, the Amended Complaint alleges that Mr. Karony made several statements related to SafeMoon partnering with the Gambia and various other technology investments.[147] These statements were material because they suggested that the SafeMoon token's value was tied to real-world endeavors and was not solely based on market speculation. And further, the Amended

---

[143] *Id.* ¶ 434(a), (b), (q)–(s).
[144] *Cf. id.* ¶¶ 62–76.
[145] *See id.* ¶¶ 210, 264, 299.
[146] *See id.* ¶ 434(d)–(e), (i), (l).
[147] *See id.* ¶¶ 434(t)–(u), (z), (dd), (gg)–(hh).

Complaint adequately alleged on "information and belief" that these statements were misleading given that it alleges that no such partnerships were actually contemplated.[148] While the PSLRA imposes a heightened pleading requirement for facts alleged on information and belief,[149] the Amended Complaint satisfies this heightened pleading requirement by setting forth the facts derived from the lawsuit between Mr. Karony and his mother.[150]

Fourth, the Amended Complaint alleges that SafeMoon and Mr. Karony made several misleading statements related to SafeMoon's innovations and market trends.[151] SafeMoon and Karony argue that these statements were "unactionable puffery."[152] SafeMoon's statement that "[t]hat wasn't a dip today . . . we went back to earth for a bigger rocket and more passengers,"[153] is simply a vague statement of corporate optimism since it is not "capable of objective verification."[154] However, SafeMoon's and Mr. Karony's statements related to innovation and internal deadlines[155] present a mixed-question at this stage. The context in which these statements were made could suggest to a trier of fact that the statements went beyond mere puffery and were capable of objective verification.[156]

---

[148] *See id.* ¶ 225.

[149] 15 U.S.C. § 78u-4(b)(1) ("[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.").

[150] Am. Compl. ¶¶ 227–38.

[151] *Id.* ¶ 434(k), (p), (y), (z).

[152] SafeMoon Mot. 14.

[153] Am. Compl. ¶¶ 196, 434(p).

[154] *Cf. Grossman*, 120 F.3d at 1119.

[155] Am. Compl. ¶ 434(k), (y); *see also id.* ¶ 184 (describing SafeMoon's communications surrounding its efforts to create its own cryptocurrency exchange and wallet, and noting that Mr. Karony stated that SafeMoon developers are using the "most innovative" features); *id.* ¶ 270 ("[Mr.] Karony announced that the Company had 'identified glaring security gaps with a lot of wallet providers' and was in the process of 'integrating game changing encryption into the wallet.' [Mr.] Karony unambiguously declared that, 'The SafeMoon wallet will be one of / if not the strongest wallets on the market.'"); *id.* ¶ 274 (alleging that Mr. Karony announced SafeMoon was "smashing out our internal deadlines" in relation to the wallet, the exchange, and "Operation Pheonix [sic]").

[156] *Cf. Grossman*, 120 F.3d at 1119–20 (compiling cases); *Hampton*, 897 F.3d at 1299–1300 (holding plaintiff failed to plead that statements asserting products were proprietary were false or misleading).

Fifth, the Amended Complaint alleges that SafeMoon made misleading statements related to the possibility of a "rug pull."[157] SafeMoon and Mr. Karony argue that these statements were not false, would not be relied upon by reasonable investors, are not actionable as to SafeMoon and Mr. Karony since the Complaint did not allege they engaged in a "rug pull," and that Mr. Karony had already disclosed that liquidity pools could be used for business expenses.[158] To begin with, the Amended Complaint does not need to allege that SafeMoon or Mr. Karony themselves engaged in a "rug pull" in order for these statements to be actionable. The Amended Complaint alleges that SafeMoon publicly stated that a "rug pull" was either not possible or not happening[159]; Rule 10b-5(b) liability is predicated on false or misleading statements, not on who or what demonstrates the falsity of the statements. Next, the Amended Complaint adequately alleges that these statements were false at the time made, given that it alleges that various defendants were in fact siphoning funds from these pools and were selling off their own tokens at inflated prices and that SafeMoon was in fact designed to be a "rug pull."[160] Further, these statements were not "plainly immaterial," given that the Amended Complaint emphasizes one of the main selling points for the SafeMoon token was that it was supposedly "safe" and was an "anti-rugpull."[161] Finally, while SafeMoon's statements related to "rug pulls" did in fact follow Mr. Karony's disclosure that the liquidity pools were not completely locked from executives,[162] the Amended Complaint alleges that the statement was false not because of the problem with liquidity pools, but because various executives had already sold off their tokens at inflated

---

[157] Am. Compl. ¶ 434(w).
[158] SafeMoon Mot. 16.
[159] Am. Compl. ¶¶ 117, 261.
[160] *E.g.*, *id.* ¶¶ 176, 259, 333, 348, 351.
[161] *See, e.g.*, *id.* ¶¶ 48, 192.
[162] *Compare id.* ¶ 194 *with id.* ¶ 117 *and id.* ¶ 261.

prices.[163] Thus, Mr. Karony's disclosure did not cure the defects in these statements for purposes of a motion to dismiss analysis.

Sixth, the Amended Complaint alleges that SafeMoon and Mr. Karony made several misrepresentations related to the timing of the launch of the SafeMoon Wallet.[164] The release of a new product is plainly material information. SafeMoon and Mr. Karony argue that these statements were not false when made.[165] Under the bespeaks caution doctrine, forward-looking representations may be considered immaterial when "the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect."[166] SafeMoon and Mr. Karony do not point to any risk disclosures with regard to the Wallet; rather, they simply point out that the Wallet was in fact released at a later date.[167] Given that the statements projected a specific release date without any risk disclosures, the Amended Complaint plausibly alleges that they were misleading.

Finally, the Amended Complaint alleges that SafeMoon and Mr. Karony made several misrepresentations related to the V2 migration.[168] SafeMoon and Mr. Karony argue that the Amended Complaint fails to identify these statements under the PSLRA.[169] The only statement that the Amended Complaint identified as misleading is that "#SAFEMOONV2 is the

---

[163] *See id.* ¶ 434(w).
[164] *Id.* ¶ 434(bb)–(cc).
[165] SafeMoon Mot. 15.
[166] *Grossman*, 120 F.3d at 1120; *see also In re Gold Resource Corp. Securities Litig.*, 957 F.Supp.2d 1284, 1293–98 (D. Colo. 2013).
[167] *Cf.* SafeMoon Mot. 15.
[168] Am. Comp. ¶ 434(ff).
[169] SafeMoon Mot. 15 n.8.

#Evolution."[170] This statement appears to be unactionable puffery on which no reasonable investor would rely.

In sum, the Amended Complaint adequately alleges that SafeMoon's and Mr. Karony's statements regarding liquidity pools, outside ventures, the possibility of a "rug pull," and the Wallet's release date were misrepresentations. The remainder identified above were not.

### C. Scienter

The second element—scienter—requires that a defendant act with "a mental state embracing intent to deceive, manipulate, or defraud, or recklessness."[171] "Recklessness . . . is defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"[172] In this context, "recklessness is akin to conscious disregard."[173] The PSLRA requires that a complaint "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[174] A complaint will survive the heightened pleading requirements imposed by the PSLRA "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[175] Motive and opportunity are relevant in weighing an inference of scienter, but they are not typically sufficient alone.[176] Crucially, when evaluating

---

[170] Am. Comp. ¶ 434(ff).
[171] *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1149 (10th Cir. 2015) (quoting *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003) (internal quotation marks omitted).
[172] *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1304–05 (10th Cir. 2020).
[173] *Id.* at 1305.
[174] 15 U.S.C. § 78u-4(b)(2).
[175] *Tellabs*, 551 U.S. at 324.
[176] *In re Zagg, Inc. Securities Litig.*, 797 F.3d 1194, 1206 (10th Cir. 2015).

scienter, a "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."[177] Finally, "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of [Section] 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority."[178] SafeMoon and Mr. Karony argue that the Amended Complaint does not adequately allege scienter against them.[179]

In support of the first claim, the Amended Complaint sets forth 11 paragraphs alleging scienter.[180] Only a handful of these could be read to suggest Defendants were acting with a particular state of mind when they made the alleged misrepresentations.[181] Indeed, of these 11 paragraphs, only four can be reasonably connected with any of the misrepresentations identified in the preceding section.[182] The remainder allege conduct that could be reprehensible, but which does not appear related to any alleged misrepresentations.[183]

The only paragraphs in the Amended Complaint that do adequately allege scienter relate to control over the liquidity pools,[184] and Mr. Karony's supposed business dealings with Gambia and other related projects.[185] These paragraphs give rise to a strong inference that both SafeMoon and Karony acted at least recklessly with regard to the truth when they made the statements identified above. First, the Amended Complaint alleges that at the same time

---

[177] *Tellabs, Inc.*, 551 U.S. at 326.
[178] *Kinder-Morgan*, 340 F.3d at 1106.
[179] SafeMoon Mot. 17–19.
[180] Am. Compl. ¶¶ 438–48.
[181] *See Smallen*, 950 F.3d at 1306, 1312 (tying scienter to the making of false or misleading statements).
[182] *See* Am. Compl. ¶¶ 439, 442, 447, 448.
[183] *See id.* ¶¶ 438, 440, 441, 443, 444, 445, 446.
[184] *Id.* ¶¶ 439, 442.
[185] *Id.* ¶¶ 447, 448.

SafeMoon published whitepapers that informed buyers that "burnt" tokens would be placed in liquidity pools that no one could access, the Executive Defendants "admitted that they intentionally decided to retain control over funds supposedly 'locked' in liquidity pools because they wanted to provide themselves with flexibility to pay for expenses that could arise in the future."[186] Given this allegation of scienter, and the supporting paragraphs earlier in the Amended Complaint, there is a strong inference that SafeMoon at least consciously disregarded the risk that its statements in the whitepapers would be misleading.

Next, the Amended Complaint alleges that Mr. Karony knew that his statements regarding "Operation Pheonix [sic]," Darkmoon, Area 32, SafeMoon's development of nanotechnology, and potential business with Gambia were false when made.[187] The Amended Complaint alleges that Mr. Karony made various statements on social media about development of SafeMoon technologies in Gambia, and, based on information and belief stemming from a separate lawsuit between Mr. Karony and his mother, Mr. Karony made these statements with the intent to increase the trading volume of SafeMoon tokens.[188] From the Amended Complaint, and having no other information against which to weigh the allegations of the Amended Complaint, the inference that Mr. Karony either intentionally or recklessly made false or misleading statements is at least as compelling as the inference that Mr. Karony had actual business plans and opportunities in Gambia that simply did not materialize.

---

[186] *Id.* ¶ 439; *see also id.* ¶¶ 69–75 (describing the whitepapers and other public statements regarding liquidity pools); *id.* ¶¶ 192–93 (describing a report finding that the executives could access funds in the liquidity pools); *id.* ¶ 194 (alleging Mr. Karony and Mr. Arriaga publicly acknowledged that the liquidity pools were not locked).
[187] Am. Compl. ¶¶ 447–48.
[188] *See id.* ¶¶ 222–38.

### D.  Reliance

SafeMoon and Mr. Karony argue that the Amended Complaint fails to adequately allege reliance.[189] There are two ways for a plaintiff to allege reliance. The first "is to show that [the plaintiff] was aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation."[190] The second is to "invoke a rebuttable presumption of reliance based on the fraud-on-the-market theory," which itself requires proof of four elements.[191] Without the fraud-on-the-market theory, "individualized issues of reliance ordinarily would defeat [the predominance requirement of Federal Rule of Civil Procedure 23] and preclude certification of a securities-fraud class action."[192] The PSLRA does not impose a heightened pleading standard on the reliance element.[193] Therefore, the Amended Complaint will survive if it plausibly alleges reliance on the part of the named Plaintiffs, or if Plaintiffs can properly invoke the fraud-on-the-market theory.

The Complaint contains one paragraph alleging reliance under Plaintiffs' first claim:

> In ignorance of the fact that the price of SAFEMOON Tokens was artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements that Defendants made and approved, or upon the integrity of the market in which the SAFEMOON Tokens were sold, or on the absence of material adverse information that these Defendants knew or recklessly should have known of but failed to disclose in public statement[s], Plaintiff[s] and the other

---

[189] SafeMoon Mot. 7–9. Mr. Nagy and Mr. Smith join in this argument. *See* Nagy Mot. 12 n.9; Smith Mot. 6–7 n.4.

[190] *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021).

[191] *Id.*

[192] *Id.* 118–19.

[193] *Cf.* 15 U.S.C. § 78u-4(b) (imposing a heightened pleading requirement on the misleading statements element and the scienter element). As the Central District of California has observed, "it is unclear whether allegations of reliance are subject to Rule 9(b)'s heightened pleading requirement." *In re NJOY, Inc. Consumer Class Action Litig.*, No. cv 14-00428 MMM (RZx), 2014 WL 12586074, at *7 (C.D. Cal. Oct. 20, 2014) (collecting cases). Regardless of whether Rule 9(b) applies to the reliance element, the court concludes that Plaintiffs fail to plausibly allege the reliance element under the standard set forth in Rule 8(a) and *Twombly* and *Iqbal*.

> Class members acquired SAFEMOON Tokens at artificially high prices and were
> damaged thereby.[194]

This lone collective statement is too conclusory to plausibly allege that individual plaintiffs

relied on any of the alleged misrepresentations. The only other areas in the Amended Complaint

in which Plaintiffs themselves are discussed do not allege any facts that could plausibly support

reliance.[195] Therefore, Plaintiffs must invoke the fraud-on-the-market presumption.

To invoke the fraud-on-the-market presumption, "a plaintiff must prove: (1) that the

alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded

in an efficient market; and (4) that the plaintiff traded the stock between the time the

misrepresentation was made and when the truth was revealed."[196] SafeMoon and Mr. Karony

argue only that the cryptocurrency exchanges used to sell SafeMoon tokens were not an

"efficient market."[197]

To determine whether securities are traded in an efficient market, courts look to several

factors: "(1) average trade volume; (2) number of securities analysts following the stock; (3)

number of market makers; (4) whether the company was entitled to file an S-3 Registration

Statement; and (5) evidence of a cause and effect relationship between unexpected news and

stock-price changes."[198] But Plaintiffs do not brief these factors, nor can most of these factors be

discerned from the Amended Complaint. For instance, while the Amended Complaint contains

various paragraphs discussing a specific daily trade volume,[199] none of these suggest what the

---

[194] Am. Compl. ¶ 450.
[195] *Cf. id.* ¶¶ 6–8.
[196] *Goldman*, 594 U.S. at 118.
[197] SafeMoon Mot. 8.
[198] *In re Myriad Genetics, Inc. Sec. Litig.*, No. 2:19-cv-00707-DBB, 2021 WL 5882259, at *8 (D. Utah. Dec. 13, 2021).
[199] *See, e.g.*, Am. Compl. ¶¶ 112, 174–75.

average trade volume was during the relevant period. And while the Amended Complaint also alleges a connection between promotional activities and unexpected news and price changes,[200] it is silent as to the other factors. Because Plaintiffs have failed to plausibly allege reliance with respect to any alleged misrepresentation, the court dismisses their Rule 10b-5(b) claim against Mr. Smith, Mr. Nagy, Mr. Karony, and SafeMoon.

### E. Loss Causation

Finally, SafeMoon, Mr. Karony, and Mr. Nagy also argue that Plaintiffs' failure to plead an efficient market means that Plaintiffs have also failed to plead loss causation.[201] The Supreme Court has rejected a theory of loss causation based simply off of buying securities at artificially inflated prices.[202] The Tenth Circuit, in *Nakkhumpun v. Taylor*, approved allegations of loss causation based on "a theory of materialization of a concealed risk."[203] In order to plead loss causation under a theory of materialization of a concealed risk, a plaintiff must allege: (1) "[t]he risk that materialized was within the zone of risk concealed by the misrepresentation (foreseeability)"; and (2) "[t]he materialization of the risk caused a negative impact on the value of the securities (causal link)."[204] Defendants' argument appears to attack the second element. However, there is nothing in *Nakkhumpun* to suggest that an allegation of loss causation must include an allegation of an efficient market, and Defendants do not otherwise provide relevant citations for their argument.

---

[200] *See, e.g.*, *id.* ¶¶ 288, 290, 294.
[201] SafeMoon Mot. 9; Nagy Mot. 12 n.9 (joining SafeMoon and Mr. Karony's argument).
[202] *Dura Pharma., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).
[203] *Nakkhumpun*, 782 F.3d at 1154.
[204] *Id.*

In any event, both elements are satisfied. Plaintiffs allege that the liquidity pools were not locked and that the Wallet was not released on schedule, contrary to defendants' representations.[205] This was sufficient for the first element. Further, they alleged that the price of SafeMoon tokens dropped significantly in response to several releases of information concerning these representations.[206] This was sufficient to allege a causal link between the materialization of a risk and the value of the SafeMoon token.

To summarize, the Amended Complaint plausibly alleges some but not all of the required Rule 10b-5(b) elements. Plaintiffs fail to state a Rule 10b-5(b) claim against Mr. Wyatt, given that they fail to allege any misrepresentations over which Mr. Wyatt had ultimate authority. Furthermore, the Amended Complaint does not plausibly allege the reliance element with respect to any alleged misrepresentation, and thus, it has failed to state a Rule 10b-5(b) claim against Mr. Smith, Mr. Nagy, Mr. Karony, and SafeMoon.

## IV.   Scheme to Deceive or Defraud Under Exchange Act Section 10(b)

Plaintiffs' second claim is for scheme liability under Section 10(b) of the Exchange Act.[207] Under Rule 10b-5(a) and (c), it is unlawful "in connection with the purchase or sale of any security" to "employ any device, scheme, or artifice to defraud," or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."[208] The elements of scheme liability are similar to those of Rule 10b-5(b); only the first element differs. To establish scheme liability Plaintiffs must allege:

> (1) a manipulative or deceptive act by the defendant in furtherance of a scheme to deceive or defraud; (2) scienter; (3) a connection between the manipulative or

---

[205] *See* Am. Compl. ¶¶ 74–75, 210, 264, 285, 289, 291–93, 299.
[206] Am. Comp. ¶¶ 294, 449–56.
[207] Am. Compl. ¶¶ 457–73.
[208] 17 C.F.R. § 240.b–5.

deceptive act and the purchase or sale of a security; (4) reliance on the defendant's manipulative or deceptive act; (5) economic loss; and (6) loss causation.[209]

Again, both Rule 9(b) and the PSLRA impose a heightened pleading requirement on some elements of this claim.[210] Defendants argue that Plaintiffs do not adequately allege the first, second, and fourth elements.[211]

### A.  Manipulative or Deceptive Act in Furtherance of a Scheme to Defraud

Mr. Wyatt, Mr. Nagy, and Mr. Smith each argue that the Amended Complaint does not allege that they performed any manipulative or deceptive act.[212] The Supreme Court has made clear that conduct not covered by Rule 10b-5(b) may be covered by subsections (a) and (c).[213] Unlike for subsection (b), subsections (a) and (c) do not require that the defendant have ultimate authority over the contents of the statement.[214] In *Lorenzo v. SEC*, the Court held that an individual who disseminates false statements can be found liable under subsections (a) and (c).[215] There, Lorenzo sent two emails to prospective investors; Lorenzo "sent the e-mails at the direction of his boss, who supplied the content and 'approved the messages.'"[216] These emails contained false and misleading statements, but Lorenzo was not the "maker" of the statement

---

[209] *Smith v. LifeVantage Corp.*, 341 F.R.D. 82, 98 (D. Utah 2022).

[210] *See supra* note 104.

[211] Wyatt Mot. 20–22; Nagy Mot. 8–12; Smith Mot. 7–11; SafeMoon Mot. 7–9, 19.

[212] Wyatt Mot. 22; Nagy Mot. 8–10; Smith Mot. 8–9. SafeMoon and Karnoy do not appear to challenge the first element. Though it does apparently make an argument that the scheme liability cause of action fails because the challenged statements are not materially false or misleading, *see* SafeMoon Mot. 13, a scheme liability cause of action does not rely upon false or misleading statements, and nowhere do SafeMoon and Karony argue that the conduct alleged by Plaintiffs was not manipulative or deceptive. One other line in SafeMoon's Motion argues that because Plaintiffs did not allege that SafeMoon or Mr. Karony "dumped" tokens, scheme liability fails. *See id.* at 19. But since that statement is subsumed within a scienter argument, the court concludes that SafeMoon and Mr. Karony have waived any challenge to the first element of scheme liability. *Cf.* SafeMoon Reply 8–9.

[213] *Lorenzo v. SEC*, 587 U.S. ---, 139 S. Ct. 1094, 1099 (2019).

[214] *Id.* at 1100.

[215] *Id.* 1101.

[216] *Id.* at 1099.

under *Janus*.[217] Nonetheless, he could be held liable under subsections (a) and (c).[218] Beyond

dissemination of false statements, courts have found liability under subsections (a) and (c) for

schemes "to artificially inflate or deflate stock prices, falsifying records to reflect non-existent

profits, and creating and distributing false research reports favorably reviewing a company,"[219]

among other things. "A pump-and-dump stock scheme is a classic violation" of subsections (a)

and (c).[220] The PSLRA does not impose a heightened pleading standard for this element,[221]

though Rule 9(b) does.[222]

      Before the court turns to whether the Amended Complaint sufficiently alleged a

deceptive or manipulative act on the part of any Defendant, there is a preliminary issue that must

be addressed. In their Opposition to SafeMoon and Mr. Karony's Motion to Dismiss, Plaintiffs

argue that the Amended Complaint alleges three separate schemes—a celebrity promotion

scheme, a scheme to drain the liquidity pools, and a scheme to engage in inherently deceptive

transactions through the 100% fee on the V1 to V2 migration.[223] SafeMoon and Mr. Karony

argue that the Amended Complaint itself only outlines a single scheme, and that Plaintiffs cannot

amend their pleading through briefing.[224] Indeed, Plaintiffs only allege that the promoter scheme

gives rise to scheme liability under Section 10(b).[225] The question is whether Plaintiffs can

---

[217] *Id.* at 1099–1100.

[218] *Id.* at 1101.

[219] *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 579 (S.D. Tex. 2002).

[220] *SEC v. Curshen*, 888 F.Supp.2d 1299, 1307 (S.D. Fla. 2012).

[221] 15 U.S.C. § 78u-4(b)(1) (imposing a heightened pleading standard on claims alleging untrue statements or omissions); *see also LifeVantage Corp.*, 429 F.Supp.3d at 1284 (holding for a scheme liability claim that "the question on this 12(b)(6) motion is not whether Plaintiffs have identified specific statements, but have plausibly pleaded facts supporting an inherently fraudulent scheme.").

[222] *See ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101–02 (2d Cir. 2007).

[223] Pls.' SafeMoon Opp'n 19–21.

[224] SafeMoon Reply 8–9.

[225] *See* Am. Compl. ¶¶ 457–73.

proceed on the theory that there are three separate schemes when the Amended Complaint only linked the facts of one scheme to its claim. At this early stage of the litigation, they can, though the court directs Plaintiffs to amend their complaint to make their intention plain.

### i. Mr. Wyatt

Mr. Wyatt argues that the Complaint does not allege that Mr. Wyatt himself did anything deceptive or manipulative, or that he was aware of the Promoter Defendants.[226] Plaintiffs respond that Mr. Wyatt committed manipulative or deceptive acts because he was part of the "inner circle" at SafeMoon, knew the liquidity pool was subject to manipulation, and knew that the Wallet would be delayed.[227] But while the Amended Complaint alleges that Mr. Wyatt was the "Chief Technology Officer and Vice President of Research and Development,"[228] and suggests that Mr. Wyatt did some coding or managed the coding on the token,[229] it does not allege that Mr. Wyatt himself did anything manipulative or deceptive. That Mr. Wyatt allegedly sold some of his SafeMoon tokens in May or June of 2021, as the price for the tokens was inflated,[230] is insufficient. Accordingly, Plaintiffs have failed to state a Rule 10b-5(a) or (c) claim against Mr. Wyatt.

### ii. Mr. Nagy

Mr. Nagy also argues that the Amended Complaint does not allege any specific manipulative or deceptive acts on his part.[231] The Amended Complaint alleges the following: Mr. Nagy was the lead developer of the SafeMoon token, and that he designed the process by

---

[226] Wyatt. Mot. 22.
[227] Pls.' Wyatt Opp'n 10.
[228] Am. Compl. ¶ 18.
[229] *Id.* ¶ 300.
[230] *Id.* ¶ 305.
[231] Nagy Mot. 8–10.

which tokens were "burnt" and allocated to liquidity pools[232]; Mr. Nagy withdrew large amounts of SafeMoon tokens from the liquidity pools[233]; and Mr. Nagy transferred large amounts of tokens to at least one of the Promoter Defendants, Mr. Keem.[234] In addition, there is a generalized allegation that Mr. Nagy sold his tokens at inflated prices.[235] Given Plaintiffs' allegations of a pump-and-dump scheme,[236] whereby promoters were hired to inflate the price of the token, while insiders sold their tokens at inflated prices, the facts alleged specific to Mr. Nagy sufficiently allege he was part of this scheme, and that he either paid Promoter Defendants from tokens in the liquidity pools, or that he personally profited from those tokens. These facts are sufficient to support a plausible inference that Mr. Nagy engaged in market manipulation.

### iii.  Mr. Smith

Mr. Smith likewise argues that the Amended Complaint does not allege that he, as opposed to SafeMoon itself, committed a manipulative or deceptive act.[237] The Amended Complaint alleges the following with regard to Mr. Smith: Mr. Smith, along with Mr. Nagy, was a lead developer on the SafeMoon token[238]; Mr. Smith participated in the marketing of the token,[239] recruited promoters,[240] and reposted promoters' social media posts[241]; and Mr. Smith sold off large portions of his tokens at inflated prices.[242] Finally, on information and belief, the

---

[232] Am. Compl. ¶¶ 19, 49, 400.
[233] Id. ¶¶ 60, 182.
[234] Id. ¶ 147.
[235] Id. ¶¶ 257, 434(w); see also id. ¶ 49 n.11.
[236] Id. ¶¶ 457–73.
[237] Smith Mot. 8–9.
[238] Am. Compl. ¶¶ 20, 49.
[239] Id. ¶ 50.
[240] Id. ¶ 154.
[241] Id. ¶¶ 157, 160, 161, 165.
[242] Id. ¶ 257.

Amended Complaint alleges that Mr. Smith participated in draining the liquidity pools.[243] As with Mr. Nagy, these allegations are sufficient for this element. Plaintiffs plausibly suggest that Mr. Smith participated in the pump-and-dump scheme by interacting with Promoter Defendants and selling his own tokens at inflated prices.

### B.  Scienter

Next, Mr. Nagy, Mr. Smith, Mr. Karony, and SafeMoon each argue that the Amended Complaint does not sufficiently allege that they acted with scienter.[244] The scienter element for scheme liability is identical to that for liability for misrepresentations. Therefore, to state a claim, the Amended Complaint must allege that the defendants acted with "a mental state embracing intent to deceive, manipulate, or defraud, or recklessness."[245] And a complaint will survive the heightened pleading requirements imposed by the PSLRA "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[246]

### i.  Mr. Nagy

Mr. Nagy argues that the Amended Complaint must be dismissed because it alleges scienter through group pleading, is devoid of particularized facts showing Mr. Nagy had contact with Promoter Defendants, and does not allege particularized facts suggesting Mr. Nagy sold any of his tokens, thus there is no strong inference of scienter sufficient for the PSLRA.[247] But, the Amended Complaint does suggest that Mr. Nagy had direct contact and made large transfers to at

---

[243] *Id.* ¶¶ 258–60.
[244] Nagy Mot. 10–12; Smith Mot. 9–11; SafeMoon Mot. 17–19.
[245] *Nakkhumpun*, 782 F.3d at 1149 (quoting *Kinder-Morgan, Inc.*, 340 F.3d at 1105 (internal quotation marks omitted)).
[246] *Tellabs*, 551 U.S. at 324.
[247] Nagy Mot. 10–12.

least one of the Promoter Defendants.[248] And it alleges that Mr. Nagy improperly withdrew large amounts of tokens from liquidity pools.[249] Given these allegations, and the allegation that Mr. Nagy was one of the developers who created the unique process whereby tokens were "burnt" as more buyers sold them off, there is an inference of scienter that is at least as compelling as any other competing inference. In other words, there is an inference that Mr. Nagy acted at least recklessly to manipulate the market by creating a cryptocurrency that generated scarcity over time, by accessing and transferring tokens out of the pools they were sent to after they had been removed from general circulation, and by seemingly hiring or paying at least one person to promote the token and thereby drive prices up.

### ii.  Mr. Smith

Mr. Smith repeats the arguments made by Mr. Nagy.[250] And as with Mr. Nagy these arguments are unpersuasive. The Amended Complaint alleges that Mr. Smith had direct contact with Promoter Defendants, and that he reposted several of Promoters' social media posts.[251] Likewise, it alleges with particularity that Mr. Smith sold large amounts of tokens at inflated prices.[252] And while, as Mr. Smith points out, this alone does not generate a strong inference of scienter,[253] taken in combination with his role as a lead developer and his promotional activities,[254] there is an inference that Mr. Smith acted at least recklessly to manipulate the market that is at least as compelling as any other inference that could be derived from these facts.

---

[248] Am. Compl. ¶ 147.
[249] *Id.* ¶¶ 60, 182.
[250] Smith Mot. 9–11.
[251] Am. Compl. ¶¶ 154, 157, 160, 161, 165.
[252] *Id.* ¶ 257.
[253] Smith Mot. 11.
[254] *Cf. Smallen*, 950 F.3d at 1308 (noting that courts cannot infer scienter based solely "on a defendant's position in a company or involvement with a particular project").

### iii.   SafeMoon and Mr. Karony

Mr. Karony and SafeMoon argue that the Amended Complaint does not sufficiently plead scienter with regard to them, since it does not allege any "dumping" on their part.[255] However, the absence of an allegation that Mr. Karony or SafeMoon itself "dumped" tokens while their value was high does not doom the Amended Complaint. The only case Defendants cite for this proposition[256] is inapposite and unpersuasive, given that it did not deal with a situation in which some but not all defendants in the alleged scheme were alleged to have dumped securities. As the Supreme Court has made clear, when evaluating scienter, a court's job is to evaluate the complaint holistically.[257]

There is a strong inference of scienter with regard to Mr. Karony. Like Mr. Nagy and Mr. Smith, the Amended Complaint alleges that Mr. Karony interacted with Promoter Defendants,[258] reposted Promoters' social media posts,[259] made his own promotional statements,[260] received or withdrew funds from the liquidity pools for personal gain,[261] and apparently was responsible for the 100% tax on the V2 migration.[262] These allegations give rise to an inference that is at least as compelling as an opposing inference that Mr. Karony at least recklessly manipulated the market through promotions.

Finally, there is a strong inference of scienter with regard to SafeMoon itself given that "[t]he scienter of the senior controlling officers of a corporation may be attributed to the

---

[255] SafeMoon Mot. 19.
[256] *See Garvey v. Arkoosh*, 354 F.Supp.2d 73, 85 (D. Mass. 2005).
[257] *Tellabs, Inc.*, 551 U.S. at 326.
[258] Am. Compl. ¶¶ 154, 162.
[259] *Id.* ¶¶ 157, 160–61.
[260] *See e.g.*, *id.* ¶¶ 83, 90–91, 99.
[261] *Id.* ¶¶ 59, 176.
[262] *Id.* ¶¶ 324–27, 330–39.

corporation itself to establish liability as a primary violator of [Section] 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority."[263]

### C. Reliance

The Supreme Court has made clear that reliance is a necessary element of scheme liability.[264] As above, the Amended Complaint contains only a generalized allegation in support of the reliance element:

> Plaintiff[s] and the Class relied on [the] promotions in deciding whether to purchase SAFEMOON Tokens (including because the price of SAFEMOON Tokens incorporated such promotions), and further relied on the reasonable assumption that they were trading in an efficient market free of manipulation.[265]

But, as explained above, this single conclusory paragraph is insufficient to allege actual reliance, or reliance based on a fraud-on-the-market theory.[266]

In summary, Plaintiffs did not plead a manipulative or deceptive act with respect to Mr. Wyatt. And with respect to Mr. Nagy, Mr. Smith, Mr. Karony, and SafeMoon, Plaintiffs did not sufficiently plead reliance. Therefore, Plaintiffs' scheme liability claim under Rule 10b-5(a) and (c) is dismissed as to all defendants.

### V.   Offer or Sale of Unregistered Securities Under Securities Act Section 12(a)(1)

Plaintiffs' third claim is based on Section 12(a)(1) of the Securities Act. Section 12(a)(1) provides that any person who "offers or sells a security in violation of [Section 5] . . . shall be liable . . . to the person purchasing such security from him."[267] Section 5 itself provides that "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person"

---

[263] *Kinder-Morgan*, 340 F.3d at 1106.
[264] *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159–60 (2008).
[265] Am. Compl. ¶ 472.
[266] *See supra* Section III.D.
[267] 15 U.S.C. § 77l(a).

to sell or offer to sell such a security in interstate commerce or through mail.[268] For purposes of a Section 12(a) claim, there are three elements: "(1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities [to the plaintiff], and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale."[269] Notably, because Plaintiffs proceed under Section 12(a)(1), this claim is not subject to either Rule 9(b)'s or the PSLRA's heightened pleading standard.[270]

Defendants collectively make three arguments with regard to Plaintiffs' Section 12(a) claim: (A) Plaintiffs have not plead that any given defendant sold or offered them a security[271]; (B) Defendants are ordinary investors not covered by the Securities Act[272]; and (C) Plaintiffs still hold their SafeMoon tokens, making any relief improper.[273]

### A. Sellers or Offerors of Securities

Section 12(a) restricts liability to certain classes of persons: offerors and sellers.[274] In *Pinter v. Dahl*, the Supreme Court held that liability under Section 12(a) "is not limited to persons who pass title" of the security.[275] Instead, because "offer" is defined by statute to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a

---

[268] *Id.* § 77e(a), (c).

[269] *SEC v. GenAudio Inc.*, 32 F.4th 902 (10th Cir. 2022).

[270] By its terms, the PSLRA is inapplicable to claims under the Securities Act. *See* 15 U.S.C. § 78u-4(b) (providing that the PSLRA applies only to claims brought under the Exchange Act). Further, because Section 12(a)(1), unlike Section 12(a)(2), is not grounded in fraud, Rule 9(b) does not apply, *cf.* 15 U.S.C. § 77l(a)(2) (providing for civil liability for making an untrue statement of material fact in the course of offering or selling a security). The Tenth Circuit has endorsed this approach with respect to a claim brought under Section 11 of the Securities Act. *See Celestial Seasonings*, 124 F.3d at 1252 ("[B]ecause plaintiff is not required to have alleged fraud to establish a prima facie [Section] 11 claim, Rule 9(b) does not apply to plaintiff's [Section] 11 claim."); *see also* Wright & Miller, *supra* note 69 at § 1301.1 n.5, n.10 (collecting cases).

[271] Wyatt Mot. 23; SafeMoon Mot. 10–11; Nagy Mot. 12–14; Smith Mot. 11–13.

[272] Wyatt Mot. 23; SafeMoon Mot. 11–12; Nagy Mot. 13.

[273] Wyatt Mot. 23; SafeMoon Mot. 13.

[274] 15 U.S.C. § 77l(a).

[275] 486 U.S. 622, 643 (1988); *see also id.* 645 n.21 (noting that Section 12(a) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers.").

security, for value,"[276] the Court held that liability may attach also to "the person who successfully solicits the purchase [of securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner."[277]

### 1. Offerors

Neither the Supreme Court nor the Tenth Circuit has explicitly defined the meaning of "solicitation" within the context of a Section 12(a)(1) claim.[278] Some Circuits have suggested, as Defendants urge, that "direct and active" solicitation is necessary for liability under Section 12(a).[279] However, more recently, both the Eleventh and the Ninth Circuits have held that mass communications through social media may give rise to liability as an offeror.[280] In *Wildes v. BitConnect International PLC*, the Eleventh Circuit reasoned that the statute simply does not support a directness requirement, given that it creates liability for the use of "'*any* means' of 'communication in interstate commerce,'"[281] and given that in 1933 the word "solicitation" was understood "to include communications made through diffuse, publicly available means" such as

---

[276] *Id.* at 643 (quoting 15 U.S.C. § 77b(3)).

[277] *Id.* at 647.

[278] *Cf. Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1307 (10th Cir. 1998) (affirming dismissal where the complaint failed to allege "facts indicating that [defendants] solicited [plaintiff's] purchase of Durango stock."); *Med Safe Northwest, Inc. v. Medvial, Inc.*, 1 F. App'x 795, 802–03 (10th Cir. 2001).

[279] *See Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989) (holding that "an issuer [is not] liable solely on the basis of its involvement in preparing the prospectus. The purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a [Section 12(a)] seller"); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) ("To count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer.").

[280] *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1344, 1345–46 (11th Cir. 2022) (holding that plaintiffs stated a Section 12(a) claim against promoters of a cryptocurrency who "posted thousands of YouTube videos extolling" it); *Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1256, 1258–61 (9th Cir. 2022) (holding that plaintiffs stated a Section 12(a) claim when the owner of a real estate fund promoted the fund through YouTube and Instagram).

[281] *Wildes*, 25 F.4th at 1345.

"newspaper and radio advertisements."[282] Finally, the Eleventh Circuit reasoned that refusing to extend liability to mass communications would create a glaring loophole in the Act.[283]

The court finds the Eleventh Circuit's reasoning more persuasive than the reasoning of those circuits apparently requiring a direct and personal offer. The plain language of the statute includes mass communications disseminated through social media platforms. Section 5 states:

> It shall be unlawful for any person, *directly or indirectly* to make use of *any* means or instruments of transportation or communication in interstate commerce . . . to offer to sell or offer to buy through the use or medium of *any prospectus* or *otherwise* any security, unless a registration statement has been filed as to such security.[284]

Section 12(a)(1) provides for private civil liability for any person who "offers or sells a security in violation of [Section 5] of this title."[285] Thus, because it is a violation of Section 5 to indirectly offer an unregistered security, civil liability based on Section 12(a)(1) may be based on such an indirect offer as well. Further, the language "any prospectus or otherwise" includes posts on social media: "The term 'prospectus' means *any* prospectus, notice, circular, advertisement, letter, or *communication*, *written* or by radio or television."[286] A social media post is, if nothing else, a written communication. Even were that not the case, the statute uses the phrase "or otherwise" as a catchall for types of mediums through which an offer is communicated.

---

[282] *Id.* at 1346.
[283] *Id.* (noting that under a "cramped reading of the Securities Act" requiring direct and personal solicitation, "a seller who would be liable for recommending a security in a personal letter could not be held accountable for making the exact same pitch in an internet video—or though other forms of communication listed as exemplars in the Act, like circulars, radio advertisements, and television commercials").
[284] 15 U.S.C. § 77e(c) (emphases added).
[285] *Id.* § 77l(a).
[286] 15 U.S.C. § 77b(10) (emphases added).

In any event, none of the cases cited by defendants in support of a direct communication requirement involve the types of mass communication at issue here,[287] and therefore are unpersuasive. It appears that the directness requirement urged by defendants stems from *Craftmatic Securities Litigation v. Kraftsow*.[288] The *Craftmatic* court made this statement in the context of holding that "an issuer [is not] liable solely on the basis of its involvement in preparing the prospectus"[289]; it had nothing to say about diffuse communications published through various forms of media. And, of course, the case itself predates the invention of social media by many years. The only case cited by any defendant that even remotely resembles the case at hand is *Risley v. Universal Navigation*.[290] There, plaintiffs sued the developers of a cryptocurrency exchange (the Uniswap Protocol trading platform) and alleged Section 12(a) liability based on two social media posts from the exchange's CEO stating that the exchange was "secure."[291] The *Risely* court reasoned that these posts were "too attenuated" to support liability under a solicitation theory.[292] But this case too is inapposite. The defendants in *Risely* did not offer or solicit sales for any particular security, but rather made statements related to a platform of exchange. By contrast, the Amended Complaint alleges that the defendants in this case were engaged in promotions of a single security.

---

[287] *See* Nagy Mot. 13 (citing *Maher*, 144 F.3d 1302); SafeMoon Mot. 10 (citing *Rozenzweig*, 332 F.3d 854); *Med Safe Nw.*, 1 F.App'x 795; *In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3d Cir. 1996); *In re OSG Sec. Litig.*, 971 F.Supp.2d 387 (S.D.N.Y. 2013)); Wyatt Reply 9 (citing *Spiegel v. Tenfold Corp.*, 192 F.Supp.2d 1261 (D. Utah 2002)); SafeMoon Reply 11 (citing *Daniels v. Blount Parrish & Co., Inc.*, 113 F. App'x 174 (7th Cir. 2004));
[288] 890 F.2d 628, 636 (3d Cir. 1989); *see, e.g.*, *Rosenzweig*, 332 F.3d at 871 (citing *Craftmatic* for the proposition that "[t]o count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer.").
[289] *Craftmatic*, 890 F.2d at 636.
[290] --- F.Supp.3d ---, 22 Civ. 2780 (KPF), 2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023).
[291] *Id.* at *1, 19.
[292] *Id.* at *19.

SafeMoon and Mr. Karony also suggest that *Pinter* requires that "[u]nder a solicitation theory, a plaintiff must plead that its relationship with a defendant is like 'traditional contractual privity.'"[293] This is a misconstruction of *Pinter*. Instead, *Pinter* states that Section 12(a) "contemplates a buyer-*seller* relationship not unlike traditional contractual privity. Thus, it is settled that [Section 12(a)] imposes liability on the *owner* who passed title, or other interest in the security, to the buyer for value."[294] In other words, something like traditional contractual privity is required in order for a buyer to impose liability on *a seller*; but *Pinter* said nothing about how closely related *an offeror* and a buyer must be.

Finally, SafeMoon and Mr. Karony argue that dismissal is warranted because Plaintiffs failed to allege successful solicitation—i.e. that they saw and were moved to purchase by Defendants' promotions.[295] Plaintiffs plead that they "saw the solicitations from Executive Defendants and the Promoter Defendants . . . and they purchased Safemoon tokens as a result of those promotions."[296] Given that neither the PSLRA nor Rule 9(b) applies to this claim, the court finds this allegation plausibly alleges successful solicitation.

Thus, defendants' arguments to the contrary are unavailing; posts on social media platforms promoting the sale of particular securities are sufficient for Section 12(a)(1) liability based on a solicitation theory. The court turns to whether the Amended Complaint has in fact alleged each moving Defendant posted on various social media platforms sufficient to state a claim under Section 12(a)(1) based on an offeror theory.

---

[293] SafeMoon Mot. 10 (quoting *Pinter*, 486 U.S. at 642–44); SafeMoon Reply 11.
[294] *Pinter*, 486 U.S. at 642 (emphases added).
[295] SafeMoon Mot. 11.
[296] *See, e.g.*, Am. Compl. ¶¶ 88–97, 99–117, 119–27, 167, 169–73, 216, 222–24.

### i.  SafeMoon and Mr. Karony

The Amended Complaint alleges that Mr. Karony and SafeMoon made numerous statements on social media that promoted the sale of the SafeMoon token.[297] This is sufficient to state a Section 12(a) claim against SafeMoon and Karony.

### ii.  Mr. Wyatt

Consistent with the analysis in the preceding sections, a bare allegation that Mr. Wyatt had access to SafeMoon's social media accounts is insufficient to state a Section 12(a) claim based on a solicitation theory.[298] The Amended Complaint does not plausibly suggest that Mr. Wyatt promoted the sale of the SafeMoon token to Plaintiffs, by social media or otherwise.

### iii.  Mr. Nagy

Likewise, the Amended Complaint does not allege that Mr. Nagy promoted the SafeMoon token in such a way that could plausibly establish Section 12(a) liability based on solicitation. Plaintiffs argue that Mr. Nagy is a proper Section 12 defendant because he drafted the SafeMoon whitepapers.[299] However, as discussed above, the Amended Complaint never alleges that Mr. Nagy in fact authored the whitepapers. And even if it had, simply drafting a prospectus or whitepaper does not mean that an individual was the entity that solicited the purchase of securities. As with Section 10(b) liability, the allegations of the Amended Complaint suggest that it was SafeMoon itself that made a solicitation through the whitepapers, not Mr. Nagy.

---

[297] *E.g. id.* ¶ 434.
[298] *Cf.* Pls.' Wyatt Opp'n 18.
[299] Pls.' Nagy Opp'n 13.

46

### iv.  Mr. Smith

As with Mr. Nagy, the Amended Complaint does not allege that Mr. Smith solicited the purchase of SafeMoon tokens through the whitepapers. However, the Amended Complaint alleges that Mr. Smith re-posted various promotions from other defendants.[300] This is sufficient to state a claim against Mr. Smith, since Mr. Smith himself engaged in promotion of SafeMoon tokens by re-posting promotional social media posts.

### 2.  Sellers

Plaintiffs argue that because "Nagy created the SafeMoon token and deposited them into the SafeMoon liquidity pool," and Plaintiffs "purchased tokens from the liquidity pool, Nagy acted as a direct counterparty to those transactions that passed title to Plaintiffs."[301] But Plaintiffs do not allege that Nagy himself passed title to securities to Plaintiffs; instead, they allege Nagy was a developer who created the tokens that they eventually bought (from some unknown entity).[302] In *Pinter*, the Supreme Court made clear that liability for sellers requires a "relationship not unlike traditional contractual privity,"[303] and that Section 12(a) "imposes liability only on the buyer's *immediate seller*; remote purchasers are precluded from bringing actions against remote sellers."[304] Plaintiffs do not allege that they had a relationship with Mr. Nagy akin to traditional contractual privity; at best, they obliquely suggest that Mr. Nagy was a remote seller. Therefore, Nagy's creation of the SafeMoon token is insufficient for purposes of Section 12(a)(1) liability.

---

[300] Am. Compl. ¶¶ 157, 160–61, 165.

[301] Pls.' Nagy Opp'n 13.

[302] *E.g.*, Am. Compl. ¶¶ 19, 49, 50.

[303] *Pinter*, 486 U.S. at 642.

[304] *Id.* at 644 n.21.

In sum, Plaintiffs have failed to state a Section 12(a)(1) claim against Mr. Nagy and Mr. Wyatt because the Complaint does not allege either individual was an offeror or seller of the SafeMoon token.

### B.  The Need for a Registration Statement

Several Defendants argue that the transactions at issue were between ordinary investors, and as such did not need to be registered under Section 5.[305] Section 4 of the Securities Act sets forth several exemptions to the registration requirements of Section 5.[306] One of the exemptions is for "transactions by any person other than an issuer, underwriter, or dealer."[307] The question is whether a Section 12 claim requires plaintiffs to allege that defendants were "an issuer, underwriter, or dealer" in order to state a claim, or whether Section 4 instead sets forth an affirmative defense.

According to Defendants, in order for Plaintiffs to state a claim under Section 12(a)(1), "they must allege facts showing they purchased their tokens from 'an issuer, underwriter, or dealer.'"[308] Not only does this contravene the general rule that the burden of proving an exception falls on the person claiming the benefit of the exception,[309] but Supreme Court and Tenth Circuit precedent also suggests otherwise. In an early case interpreting the scope of the exemption in response to a dismissal of the suit, the Supreme Court noted that given "the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer

---

[305] SafeMoon Mot. 11–12; Wyatt Mot. 23; Smith Mot. 13.
[306] 15 U.S.C. § 77d(a).
[307] *Id.* § 77d(a)(1).
[308] SafeMoon Mot. 12.
[309] *E.g. U.S. v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967); *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 91–92 (2008).

who would plead the exemption seems to us fair and reasonable."[310] Though in different

procedural postures, the Tenth Circuit has likewise noted that persons "claiming the availability

of the exemption from registration" have the burden of proof.[311] More recently, in *SEC v.*

*GenAudio Inc.*, the Tenth Circuit, on appeal from a grant of summary judgment for the SEC,

noted that exemptions under Section 4 "can be asserted as affirmative defenses."[312] Several other

Circuits have reiterated this rule.[313] And while SafeMoon and Mr. Karony cite one district court

that suggests that the exemptions from Section 4 are elements that must be pleaded by plaintiffs,

that case did not devote any significant analysis to the issue.[314] Given that courts are clear that

persons claiming the exemption have the burden of proving the exemption and given that this

aligns with the general rule of statutory construction, the court concludes that Section 4

exemptions are affirmative defenses.[315]

In order for a party to prevail on an affirmative defense on a motion to dismiss, the

operative pleading must allege facts sufficient to establish the defense.[316] That is not the case

here.

---

[310] *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).
[311] *Quinn & Co. v. SEC*, 452 F.2d 943, 945–46 (10th Cir. 1971); *see also G. Eugene Eng. Found. v. First Fed. Corp.*, 663 F.2d 988, 989 (10th Cir. 1973).
[312] 32 F.4th 902, 911, 939 (10th Cir. 2022).
[313] *See Ackberg v. Johnson*, 892 F.2d 1328, 1335 (8th Cir. 1989); *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980); *Doran v. Petroleum Mgmt. Corp.*, 545 F.2d 893, 899 (5th Cir. 1977) (describing the exemption as "an affirmative defense").
[314] *See In re Scattered Corp. Sec. Litig.*, 844 F.Supp. 416, 421 (N.D. Ill. 1994).
[315] *See* Defense, Black's Law Dictionary (11th ed. 2019) ("Affirmative defense. A defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true. The defendant bears the burden of proving an affirmative defense.").
[316] *Miller*, 345 F.2d at 893; *accord Fernandez*, 883 F.3d at 1299.

### C. Relief Available

According to SafeMoon, Mr. Karony, and Mr. Wyatt, Plaintiffs have not sought an appropriate remedy, and therefore their claim must be dismissed.[317] Section 12(a) allows a plaintiff to recover damages only "if he no longer owns the security," and otherwise the plaintiff may sue only for recission.[318] Plaintiffs argue that this provision "only affects the statutory measure of damages they can obtain and has no bearing on whether a Section 12 claim has been properly alleged."[319]

The Tenth Circuit has clarified that "Section [12] does not say when the tender should be made."[320] And while it has approved of a trial court permitting plaintiffs to amend their complaint in order to make the required tender, it did not suggest a Section 12(a)(1) claim requires tender upon filing of a complaint.[321] Other circuits that have considered the issue are in agreement. For instance, in *Wigland v. Flo-Tek, Inc.*, the Second Circuit held that a complaint that included "recission" as part of the relief prayed for was sufficient to constitute a tender offer.[322] The Amended Complaint prays for "rescission," among other things.[323] Therefore, the relief sought by Plaintiffs is proper.

---

[317] Wyatt Mot. 23; SafeMoon Mot. 13.

[318] 15 U.S.C. § 77l(a).

[319] Opp'n to SafeMoon Mot. 10–11.

[320] *Stadia Oil & Uranium Co. v. Wheelis*, 251 F.2d 269, 273 (1957).

[321] *Id.* at 273–74; *see also Gardner v. Investors Diversified Cap., Inc.*, 805 F.Supp. 874, 878–79 (D. Colo. 1992); *Rochambeau v. Brent Expl., Inc.*, 79 F.R.D. 381, 388 (D. Colo. 1978) ("Since defendants have not indicated any prejudice to them if the tender is permitted at this time, plaintiff is ordered to tender the security to the clerk of the court at the time he files his amended complaint.").

[322] 609 F.2d 1028, 1035 (2d Cir. 1979).

[323] Am. Compl. ¶ 183.

In sum, Plaintiffs have stated a Section 12(a)(1) claim against Mr. Smith, Mr. Karony, and SafeMoon. Because the Amended Complaint does not plausibly allege that Mr. Wyatt or Mr. Nagy offered or sold SafeMoon tokens, it has failed to state a claim against those defendants.

## VI.  Control Person Liability Under Securities Act and Exchange Act

Plaintiffs assert two control person liability claims. Plaintiffs' fourth claim asserts control person liability under Section 15 of the Securities Act against the Executive Defendants, and their fifth claim asserts control person liability against the Executive Defendants under Section 20 of the Exchange Act.[324] These provisions provide for joint and several liability for any person who controls another person who is liable under either Section 10(b) of the Exchange Act or Section 12(a) of the Securities Act.[325] In the Tenth Circuit, "to state a prima facie case for control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."[326] There is no requirement that a plaintiff allege "the defendant actually or culpably participated in the primary violation."[327] Defendants collectively challenge both elements.[328]

---

[324] Am. Compl. ¶¶ 483–98.

[325] 15 U.S.C. § 78t(a) ("Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."); *id.* § 77o(a) ("Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged.").

[326] *Maher*, 144 F.3d at 1305.

[327] *Id.*

[328] Wyatt Mot. 23–24; SafeMoon Mot. 20; Nagy Mot. 14–15; Smith Mot. 13–14.

### A.  Primary Violations

All Defendants assert that the control person claims fail because Plaintiffs have failed to plead a primary violation.[329] While Plaintiffs have not adequately alleged a primary violation of Section 10(b),[330] they have done so under Section 12(a).[331] Therefore, the control person liability claim based on Section 20 of the Exchange Act is dismissed against all defendants, while the control person liability claim based on Section 15 of the Securities Act is not.

### B.  Control Over a Primary Violator

Mr. Nagy and Mr. Smith argue that the Amended Complaint does not allege that they had control over a primary violator of the securities laws.[332] Whether an individual or entity is a control person "is a factual question not ordinarily subject to resolution on a motion to dismiss," however, "dismissal is appropriate when . . . a plaintiff does not plead any facts from which it can be reasonably inferred the defendant was a control person."[333] SEC regulations define "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."[334] Possession of a majority share in a company alone is insufficient to allege control, absent allegations that the majority holder took some actions that suggest control.[335] Likewise, the Tenth Circuit has distinguished between directors and officers of a corporation: "The assertion that a person was a member of a corporation's board of directors,

---

[329] Wyatt Mot. 23–24; SafeMoon Mot. 20; Nagy Mot. 14–15; Smith Mot. 13–14.
[330] *See supra* Parts III, IV. Because the Complaint does not sufficiently allege reliance for either of its Section 10(b) claims, the court need not determine whether it has stated the other elements of a primary violation against any of the non-moving Defendants.
[331] *See supra* Part V.
[332] Nagy Mot. 14–15; Smith Mot. 13–14.
[333] *Maher*, 144 F.3d at 1306.
[334] 17 C.F.R. § 230.405.
[335] *Maher*, 144 F.3d at 1305–06.

without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person."[336]

Mr. Nagy and Mr. Smith are correct that Plaintiffs' conclusory allegations that all Executive Defendants were control persons are insufficient to state a claim.[337] The Complaint alleges that Mr. Nagy "was the founder of" SafeMoon[338] and was the primary developer of the SafeMoon token;[339] that Mr. Smith, along with Mr. Nagy, wrote the code for the SafeMoon token;[340] and that the "Executive Defendants [including Mr. Nagy and Mr. Smith] launched the SafeMoon tokens" on March 8, 2021.[341] These specific factual allegations do not plausibly allege that Mr. Nagy or Mr. Smith had control over the management or policies at SafeMoon during the relevant period. In other words, the mere allegation that an individual was the founder of a company, developed a product, or launched a product does not by itself plausibly suggest that that individual had the power to direct the management and policies of a company at the relevant time.

---

[336] *Kinder-Morgan*, 340 F.3d at 1108; *see also In re SemGrp. Energy Partners, L.P.*, 729 F.Supp.2d 1276, 1302 (N.D. Okla. 2010) (finding control person liability for officers of violator entity, but not for officer of parent entity).
[337] Am. Compl. ¶ 460 ("[The Executive Defendants] by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were . . . controlling persons within the meaning of Section 15 of the Securities Act."); *id.* ¶ 461 ("[The Executive Defendants] separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of SafeMoon, through ownership of voting securities, by contract, subscription agreement, or otherwise."); *id.* ¶ 462 ("[The Executive Defendants] also have the power to direct or cause the direction of the management and policies of SafeMoon.").
[338] *Id.* ¶ 19.
[339] *Id.* ¶ 49.
[340] *Id.* ¶ 49.
[341] *Id.* ¶ 54.

Therefore, because the Amended Complaint does not plausibly allege that Mr. Nagy and Mr. Smith exercised control over the sale of SafeMoon tokens without a registration statement, it has failed to state a control person claim against them.

## VII.   RICO

Plaintiffs' tenth claim is for a RICO violation against the Executive Defendants and certain Promoter Defendants based on allegedly misleading promotions of the SafeMoon token.[342] The federal RICO statute provides for a private civil cause of action[343] that alleges a defendant's "(1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity."[344] To constitute a "pattern," there must be "at least two acts of racketeering activity."[345] The definition of "racketeering activity" incorporates by reference numerous other federal criminal statutes, including mail and wire fraud[346]—the predicate acts alleged in this case.[347] "To establish the predicate act of mail fraud, [Plaintiffs] must allege '(1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails for the purpose of executing the scheme.' 'The elements of wire fraud are very similar, but require that the defendant use interstate wire, radio or television communications in furtherance of the scheme to defraud.'"[348] Finally, because mail fraud and wire fraud are species of "fraud," plaintiffs must also adequately allege, under Rule 9(b)'s heightened pleading standard, the following nine elements: "(1) a

---

[342] Am. Compl. ¶¶ 527–60.
[343] 18 U.S.C. § 1964.
[344] *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) (citing 18 U.S.C. § 1962).
[345] 18 U.S.C. § 1961(5).
[346] *Id.* § 1961(1); *see also* Am. Compl. ¶ 544 (alleging mail and wire fraud).
[347] Am. Compl. ¶¶ 548–53.
[348] *Tal*, 453 F.3d at 1263 (quoting *Baccus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 892 (10th Cir. 1991); *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1102 (10th Cir. 1999)).

representation; (2) that is false; (3) that is material; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent it be acted on; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance; (8) the hearer's right to rely on it; and (9) injury."[349] Finally, RICO plaintiffs must also allege an injury to business or property caused by the RICO violation.[350]

Defendants argue that the Private Securities Litigation Reform Act ("PSLRA") prohibits RICO claims alleging securities fraud[351] and that Plaintiffs fail to adequately allege certain substantive elements of a RICO violation against certain defendants.[352]

"The PSLRA amended the RICO statute to provide that 'no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO].'"[353] In other words, if conduct violated Section 10(b), it cannot also form the basis of a civil RICO claim.[354] Defendants argue that because Plaintiffs have alleged that the same conduct underlies both their RICO and securities claims, their RICO claim is barred.[355] Plaintiffs' principal argument to the contrary is that the court could later hold that cryptocurrencies are not "securities" within the meaning of federal securities law, and thus, it is improper to dismiss their RICO claims at this stage.[356] Defendants counter that pleading a RICO claim in the alternative is still barred by the PSLRA.[357]

---

[349] *Id.* (quoting *BancOklahoma Mortg. Corp.*, 194 F.3d at 1103).
[350] *See* 18 U.S.C. § 1964(c); *Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir. 2003).
[351] *See* Wyatt Mot. 14–15; SafeMoon Mot. 20–21; Smith Mot. 14.
[352] *See* Wyatt Mot. 12–14; Nagy Mot. 16–21; Smith Mot. 14–15.
[353] *Bixler v. Foster*, 596 F.3d 751, 759 (10th Cir. 2010) (citing Pub. L. No. 104-67, § 107, 109 Stat. 737, 758 (Dec. 22, 1995)); *see also* 18 U.S.C. § 1964(c).
[354] *See Bixler*, 596 F.3d at 759–60.
[355] *See* Wyatt Mot. 14–15; SafeMoon Mot. 20–21; Smith Mot. 14.
[356] *E.g.*, Pls.' SafeMoon Opp'n 23.
[357] SafeMoon Reply. 3–4; Smith Reply. 7–8; Wyatt Reply 10.

The court is not persuaded by Plaintiffs' argument, and it need not address whether the PSLRA prohibits alternative pleading. It is enough that for the purposes of their motions to dismiss Defendants have accepted that the SafeMoon token is a security, meaning that Defendants' conduct "would have been actionable" as securities fraud. Accordingly, the court finds that Plaintiffs have failed to state a RICO claim against any defendants, and it need not reach the remaining arguments raised by the parties. If, at a later stage in this case, the court determines that the SafeMoon token is not a security, it will permit Plaintiffs to amend their pleadings to re-allege a RICO claim.

## VIII.   State Law Claims

Defendants collectively raise several arguments against Plaintiffs' state law claims: the court should dismiss for lack of subject-matter jurisdiction, if it dismisses all federal claims[358]; Plaintiffs' FDUTPA claim fails because it does not adequately plead actionable conduct on behalf of particular defendants[359] and because the statute does not apply to securities transactions[360]; the conspiracy claim should be dismissed because it fails to identify the law on which it was based,[361] and because it fails to allege the required elements under Utah or California law with the adequate particularity[362]; the unjust enrichment claim fails because it is not a standalone cause of action under California law, and plaintiffs have not alleged that they lack an adequate remedy at law[363]; and the conversion claim should be dismissed because neither Utah law nor California law applies, and because the Complaint does not allege that Defendants

---

[358] Wyatt Mot. 24–25; SafeMoon Mot. 21.
[359] Wyatt Mot. 9–12; SafeMoon Mot. 24; Nagy Mot. 22–24; Smith Mot. 16–18.
[360] SafeMoon Mot. 24; Nagy Mot. 22; Smith Mot. 16.
[361] Wyatt Mot. 15–16; Smith Mot. 18; SafeMoon Mot. 23;
[362] Wyatt Mot. 16–18; SafeMoon Mot. 23–24; Nagy Mot. 21–22; Smith Mot. 18–20.
[363] Wyatt Mot. 24; SafeMoon Mot. 25; Nagy Mot. 24–25; Smith Mot. 20–21.

converted their tokens.[364] After addressing the supplemental jurisdiction argument, the court turns to a conflict of law analysis, and then to the remaining arguments.

### A. Supplemental Jurisdiction

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."[365] However, if "the district court has dismissed all claims over which it has original jurisdiction," the district court "may decline to exercise supplemental jurisdiction."[366] In the Tenth Circuit, absent extenuating circumstances, "[a] district court should normally dismiss supplemental state law claims after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial."[367] Mr. Wyatt, Mr. Karony, and SafeMoon argue that the court should dismiss all state law claims for lack of supplemental jurisdiction if it dismisses all the federal claims.[368]

It is true that the court has supplemental jurisdiction over Plaintiffs' state law claims.[369] These claims clearly arise from the same case and controversy as the federal claims, since all deal with Defendants' conduct in developing, promoting, and selling SafeMoon tokens. However, because the court has not dismissed all federal claims, supplemental jurisdiction over the state law claims remains proper.

---

[364] SafeMoon Mot. 21–23.
[365] 28 U.S.C. § 1367(a).
[366] *Id.* § 1367(c).
[367] *Foxfield Villa Assocs., LLC v. Robben*, 967 F.3d 1082, 1103 (10th Cir. 2020).
[368] Wyatt Mot. 24–25; SafeMoon Mot. 21.
[369] *See* Am. Compl. ¶ 28.

57

### B. Conflict of Laws

Several of Defendants' arguments implicate the issue of which state's substantive law applies to Plaintiffs' claims.[370] To begin with, several Defendants repeatedly argue that Plaintiffs' claims must be dismissed because Plaintiffs do not cite which state's law governs their claim or because Plaintiffs cite to the incorrect state's law.[371] The court is not persuaded by the single case cited by Defendants in support of this argument,[372] especially in light of binding caselaw that indicates otherwise.[373] These issues can be addressed through a conflict of laws analysis.[374]

Thus, the court: (1) addresses which state's conflict of laws rules apply; (2) determines whether there is an actual conflict between the laws of the states potentially interested in the dispute; and (3) if there is such a conflict with regard to each claim, addresses which state's law applies.

---

[370] For instance, moving Defendants have argued that the FDUTPA cannot apply because Plaintiffs did not allege deceptive acts taking place within Florida, *see* Wyatt Mot. 9; SafeMoon Mot. 24; Nagy Mot. 22, 24; Smith Mot. 16, 18, that Plaintiffs' conspiracy claim should be dismissed because Plaintiffs did not specify in the Complaint which state's law controlled, *see* Wyatt Mot. 15–16; Smith Mot. 18; SafeMoon Mot. 23, and that neither Utah nor California law applies to Plaintiffs' conversion claims, *see* SafeMoon Mot. 21–23. Thus, while it is true that some courts have deferred a conflict of laws analysis to a later stage in the proceedings, *see, e.g.*, *Energy Coal v. CITGO Petroleum Corp.*, 836 F.3d 457, 459 (5th Cir. 2016), many of the parties' arguments necessitate that the court conduct a conflict of laws analysis in order to determine whether Plaintiffs have adequately stated their claims.
[371] *See* Wyatt Mot. 15–16; Wyatt Reply 11; Wyatt COL 7–8; Smith Mot. 18; SafeMoon Mot. 23.
[372] *Cf. In re TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F.Supp.2d 955, 966 (N.D. Cal. 2011) (suggesting that unless a plaintiff indicates which law supports their claim, the court cannot determine whether it has been adequately pled).
[373] *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam) (holding a plaintiff that adequately plead facts was not required to invoke Section 1983 in order to state a claim); *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1279–80 (10th Cir. 2004).
[374] *See, e.g.*, *Hoiles v. Alioto*, 461 F.3d 1224, 1230–35 (10th Cir. 2006) (conducting a conflict of law analysis and holding California law applied to a fee arrangement provision in a contract); Am. Compl., *Hoiles v. Alioto*, No. 04-F-0438 (OES), 2004 WL 4909276 (D. Colo. Oct. 4, 2004) (implicitly suggesting Colorado law applied to the contract); *Kipling v. State Farm Mut. Auto. Ins. Co.*, 774 F.3d 1306 (10th Cir. 2014); Compl. & Jury Demand, *Kipling v. Sate Farm Mut. Auto. Ins. Co.*, No. 11CV01948, 2011 WL 10858363 (D. Colo. July 27, 2011).

### 1. Utah's Conflict of Law Rules Apply

Generally, a federal court exercising supplemental jurisdiction applies the conflict of laws rules of the state in which it sits.[375] However, the analysis is not as simple when venue has been transferred. When venue is transferred pursuant to 28 U.S.C. § 1404(a)—where venue was proper in the initial forum—"the transferee district court must be obligated to apply the state law that would have been applied if there had been no change in venue."[376] However, when venue is transferred pursuant to 28 U.S.C. § 1406(a)—where venue was improper in the initial forum—courts typically apply the law of the state in which the transferee court sits.[377] In addition, the Tenth Circuit has held that "[w]hen the transferor court lacks personal jurisdiction . . . the choice of law rules of the transferee court apply."[378]

The case here was initially filed in the Central District of California.[379] That court transferred the case pursuant to a stipulation from the parties.[380] The stipulation suggests that venue was transferred "[i]n the interest of justice and for the convenience of the parties and witnesses,"[381] thus, mirroring the language of 28 U.S.C. § 1404. However, for venue to be proper, it must comport with 28 U.S.C. § 1391(b):

A civil action may be brought in—

---

[375] *See Klaxton Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that federal courts sitting in diversity apply the conflict of law rules of the state in which they sit); *BancOklahoma Mortg. Corp.*, 194 F.3d at 1103 (holding the rule from *Klaxton* "also applies when a federal court exercises supplemental jurisdiction over state law claims in a federal question lawsuit").

[376] *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964).

[377] *Cf. Atlantic Marine*, 571 U.S. at 65 (holding that the *Van Dusen* rule does not apply when the plaintiff inappropriately filed suit in the wrong forum due to a forum-selection clause); *see also* Wright & Miller, *supra* note 69 at § 3846 (compiling cases in footnotes 29 and 30).

[378] *Doering ex rel. Barrett v. Copper Mountain, Inc.*, 259 F.3d 1202, 1209 (10th Cir. 2001).

[379] *See* Class Action Compl., ECF No. 1; Securities Class Action Consolidated Compl., ECF No. 59.

[380] Order on Stipulation Re: Venue Transfer, ECF No. 75.

[381] *Id.* at ¶ 1.

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . .

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.[382]

Accepting the allegations of the Amended Complaint as true, the Defendants here reside in several different states (Utah, Pennsylvania, Florida, New Hampshire, California, Georgia, and New York) and in the United Kingdom.[383] Therefore, no proper venue can be determined by Section 1391(b)(1). And the Amended Complaint does not suggest that a "substantial part of the events or omissions giving rise to the claim occurred" in California; rather, it suggests that the alleged activities were centered around SafeMoon and its executives, who were primarily located in Utah.

Therefore, because venue was improper in California and would have been proper in Utah, Utah's conflict of law rules apply.[384] The court need not then reach the issue of whether California had personal jurisdiction over Defendants. Utah has adopted the most significant relationship test of the Second Restatement of Conflict of Laws for all claims.[385]

## 2. Actual Conflict

Under Utah's conflict of law rules, "a choice of law analysis is preceded by a determination of whether there is a true conflict between the laws of those states that are

---

[382] 28 U.S.C. § 1391(b).
[383] *See* Am. Compl. ¶¶ 9–27.
[384] All parties agree that this is the correct result. *See* Pls.' COL 2; SafeMoon COL 1, 2; Wyatt COL 4.
[385] *See Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 14, 54 P.3d 1054.

interested in the dispute."[386] Where there is no conflict, "a choice of law analysis is

unnecessary."[387] "A true conflict exists if 'the outcome would differ depending on which state's

law is applied.'"[388]

Plaintiffs have asserted four distinct state law claims against SafeMoon and the Executive

Defendants: violation of the FDUTPA, conspiracy, unjust enrichment, and conversion.[389] The

list of potentially interested jurisdictions includes Utah, Pennsylvania, Florida, New Hampshire,

California, Georgia, New York, and the United Kingdom.[390] The parties largely agree that Utah,

California, or Florida law should apply,[391] so the court will assume the law of one of those

jurisdictions applies to each of Plaintiffs' claims.[392]

First, there is a true conflict between Utah, California, and Florida with regards to the

FDUTPA claim. While both Florida and California have statutes substantially modeled on the

FTC Act,[393] Utah does not.[394] Second, there is an actual conflict between Utah, California, and

Florida law on Plaintiffs' conspiracy claim. While the elements of a civil conspiracy claim in

each of these states are largely the same, Florida permits liability for civil conspiracy based only

---

[386] *One Beacon Am. Ins. Co. v. Huntsman Polymers Corp.*, 2012 UT App 100, ¶ 27 n.10, 276 P.3d 1156 (citing *Am. Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 188 (Utah 1996)).

[387] *Applied Predictive Techs., Inc. v. MarketDial, Inc.*, 598 F.Supp.4d 1264, 1274 (D. Utah. 2022) (citing *St. Paul Fire & Marine Ins. v. Com. Union Assurance*, 606 P.2d 1206, 1208 n.1 (Utah 1980)).

[388] *Id.* (quoting *Johnson v. Blendtec, Inc.*, 500 F.Supp.3d 1271, 1279 (D. Utah 2020)).

[389] Am. Compl. ¶¶ 514–526, 561–87.

[390] These are the jurisdictions in which a named plaintiff or a defendant resides. *See id.* ¶¶ 6–27.

[391] *See* Pls.' COL 1; SafeMoon COL 1; Nagy COL 1; Wyatt COL 2; Smith COL 2.

[392] *See TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1180–81 (10th Cir. 2007).

[393] *See* Fla. Stat. §§ 501.201–.213; Cal. Bus. & Prof. Code § 17200.

[394] *Cf. Garrard v. Gateway Financial Services, Inc.*, 2009 UT 22, ¶ 9, 207 P.3d 1227 (noting that Utah's Unfair Practices Act only prohibits anticompetitive behavior, not "unfair or deceptive acts"); *see also* Utah Session Law 36, https://le.utah.gov/~2023/bills/static/HB0035.html [https://perma.cc/88CA-W23U] (repealing Utah's Unfair Practices Act).

on an "overt act in pursuance of the conspiracy,"[395] while Utah[396] and California[397] require a tortious or unlawful act. Third, there is a conflict between Utah, California, and Florida law on Plaintiffs' unjust enrichment claim. Utah and Florida treat unjust enrichment as a separate cause of action,[398] while California treats it solely as a remedy.[399] And fourth, there is a conflict

---

[395] *Walters v. Blankenship*, 931 So.2d 137, 140 (Fla. Dist. Ct. App. 2006) ("The elements of a civil conspiracy are: (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damages to plaintiff as a result of the acts performed pursuant to the conspiracy.")

[396] *Pyper v. Reil*, 2018 UT App 200, ¶ 16, 437 P.3d 493 ("The tort of civil conspiracy requires proof of five elements by clear and convincing evidence: '(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.'" (quoting *Pohl, Inc. v. Am. v. Webelhuth*, 2008 UT 89, ¶ 29, 201 P.3d 944)).

[397] *City of Industry v. City of Fillmore*, 129 Cal.Rptr.3d 433, 450 (Cal. Ct. App. 2011) ("The elements of a civil conspiracy are (1) the formation of a group of two or more persons who agreed to a common plan or design to commit a tortious act; (2) a wrongful act committed pursuant to the agreement; and (3) resulting damages."). While it is true that California courts have noted that "[c]ivil conspiracy is not an independent tort," *id.*; *see also Ent. Rsch., Grp. Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1228 (9th Cir. 1997) ("Under California law, there is no separate and distinct tort cause of action for civil conspiracy."), California courts are also clear that civil conspiracy simply "must be activated by the commission of an actual tort," *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 511 (Cal. 1994). In other words, as the elements suggest, there must be a predicate tortious act that gives rise to liability for civil conspiracy; it does not necessarily mean that plaintiffs cannot pursue a cause of action for civil conspiracy. *See City of Industry*, 129 Cal.Rptr.3d at 450 ("We construe the fifth count for fraud and the tenth count for conspiracy together as a single count.").

[398] *See Howard v. Manes*, 2013 UT App 208, ¶ 30, 309 P.3d 279 ("An unjust enrichment claim has three elements: '(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.'" (quoting *Rawlings v. Rawlings*, 2010 UT 52, ¶ 29, 240 P.3d 754)); *Extraordinary Title Servs., LLC v. Fla. Power & Light Co.*, 1 So.3d 400, 404 (Fla. Dist. Ct. App. 2009) ("The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the conferred benefit; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." (quoting *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla.*, 667 So.2d 876, 879 (Fla. Dist. Ct. App. 1996))).

[399] *De Havilland v. FX Networks, LLC*, 230 Cal.Rptr.3d 625, 646 (Cal. Ct. App. 2018) ("Unjust enrichment is not a cause of action.' It is 'just a restitution claim.'" (quoting *Hill v. Roll Int'l Corp.*, 128 Cal.Rptr.3d 109, 118 (Cal. Ct. App. 2011))).

between Utah, California, and Florida law on Plaintiffs' conversion claim. Utah[400] and

(apparently) Florida[401] require an element of willfulness, while California does not.[402]

### 3.  Most Significant Relationship

There are two steps to the most significant relationship test: first, the court characterizes

the nature of the claim according to the law of the forum state, and second, it determines which

state has the most significant relationship to the occurrence and the parties based on the relevant

set of factors from the Restatement.[403] Importantly, courts conduct a conflict of law analysis

issue-by-issue.[404] Therefore, the court conducts each of these steps with regard to each claim

discussed below.

### C.  The FDUTPA

The FDUTPA mirrors the Federal Trade Commission Act[405] and prohibits "[u]nfair

methods of competition, unconscionable acts or practices, and unfair or deceptive acts or

practices in the context of any trade or commerce."[406] The Act provides for a civil cause of

---

[400] *See Rand v. KOA Campgrounds*, 2014 UT App 246, ¶ 11, 338 P.3d 222 ("To prove conversion, a party must establish 'an act of willful interference with property, done without lawful justification, by which the person entitled to property is deprived of its use and possession,' and that the party is 'entitled to immediate possession of the property at the time of the alleged conversion.'" (quoting *Jones & Trevor Mktg., Inc. v. Lowry*, 2010 UT App 113, ¶ 15 n.13, 233 P.3d 538)).

[401] *Hannah v. Malk Holdings, LLC*, 368 So.3d 1087, 1091 (Fla. App. 2023) ("The elements of conversion are: 1) taking of chattels; 2) with intent to exercise ownership over them an ownership inconsistent with the real owners' right of possession.").

[402] *Lee v. Hanley*, 354 P.3d 334, 344 (Cal. 2015) ("'The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages.'" (quoting *Welco Electronics, Inc. v. Mora*, 223 Cal.App.4th 202, 208 (2014)); *Welco*, 223 Cal.App.4th at 208 ("Conversion is a strict liability tort.").

[403] *See Waddoups*, 2002 UT 69, ¶¶ 15, 16, 18.

[404] *See Volonte v. Domo, Inc.*, 2023 UT App 25, ¶¶ 33–35, 528 P.3d 327; *Johnson v. Continental Airlines Corp.*, 964 F.2d 1059, 1064 ("We acknowledge the Restatement incorporates a selective, issue-by-issue approach to determining choice of law." (citing Restatement (Second) of Conflict of Laws § 145, cmt. d (Am. L. Ins. 1977)).

[405] *See Crowell v. Morgan, Stanley, Dean Witter Servs. Co., Inc.*, 87 F.Supp.2d 1287, 1294 (S.D. Fla. 2000).

[406] Fla. Stat. § 501.204(1).

action for any person aggrieved by a violation of the Act.[407] All moving defendants make conclusory arguments that the FDUTPA claim fails because Plaintiffs do not allege deceptive acts taking place in Florida.[408] Next, SafeMoon, Mr. Smith, and Mr. Nagy argue that the FDUTPA does not apply to securities transactions.[409] And finally, Mr. Nagy, Mr. Smith, and Mr. Wyatt argue that Plaintiffs fail to allege the required elements of a FDUTPA claim against them.[410] The court first engages in a conflict of laws analysis to determine which state's law applies to the FDUTPA claim.

While Utah does not recognize a deceptive or unfair trade practices claim,[411] other courts typically treat such claims as being grounded in tort—given that such a claim is premised on a duty established by law, not by agreement[412]—subject to Section 145 of the Restatement. Therefore, the court here does the same.

Under Section 145, courts look to four factors to decide which state has the most significant relationship to the occurrence and the parties: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."[413] The comments to Section 145 make clear that the place where the injury occurred is of less importance than the place where the conduct causing the injury occurred when the injury is not one of bodily injury, such as in cases

---

[407] *Id.* § 501.211(1).
[408] Wyatt Mot. 9; SafeMoon Mot. 24; Nagy Mot. 22, 24; Smith Mot. 16, 18.
[409] SafeMoon Mot. 24; Nagy Mot. 22, 24; Smith Mot. 16, 18.
[410] Nagy Mot. 22–23; Smith Mot. 16–17; Wyatt Mot. 9–12.
[411] *See* sources cited *supra* note 394 and accompanying text.
[412] *See, e.g., Guidance Endodontics, LLC v. Dentsply Intern., Inc.*, 663 F.Supp.2d 1138, 1150–52 (D.N.M. 2009); *Anapoell v. Am. Express Business Finance Corp.*, 2007 WL 4270548, at *11 (D. Utah. Nov. 30, 2007).
[413] Restatement (Second) of Conflict of Laws § 145(2).

involving fraud.[414] Further, a business's principal place of business is of greater importance than a plaintiff's place of domicile in cases involving business torts, such as unfair competition.[415]

At the outset, Plaintiffs do not make any distinction between the conflict of laws issues with respect to any of their claims—they treat each state-law claim identically for conflict of laws purposes. They argue that the place where the injuries occurred should be determined by the domicile of named Plaintiffs—Florida, California, and Pennsylvania; that the conduct causing the injury should be determined from the domicile of each Defendant—Utah, Florida, and California; and that the relationship between the parties is determined by the domicile of named Plaintiffs.[416] Thus, Plaintiffs argue that "the states of Florida, California, and Utah have the 'most significant relationship' to the occurrences alleged by the" Amended Complaint, and therefore, those states' laws apply.[417] But Plaintiffs do not explain why Florida law—as opposed to California law, Utah law, or Pennsylvania law—should govern their unfair and deceptive trade practices claim with respect to *all* Plaintiffs. For instance, as between Plaintiff Iacob (a resident of California)[418] and Defendants, it is not clear why Florida law should apply to the alleged wrongful conduct. And while Defendant Nagy is also a resident of Florida,[419] the allegations in the Amended Complaint do not suggest that Mr. Nagy's conduct was the gravamen of the FDUTPA claim.[420] Therefore, Plaintiffs' arguments are unpersuasive, as they do not accurately apply the most significant relationship test.

---

[414] *Id.* cmt. e.

[415] *Id.*

[416] Pls.' COL 4–7.

[417] *Id.* at 3–4.

[418] Am. Compl. ¶ 7.

[419] *Id.* ¶ 19.

[420] *Cf. id.* ¶ 573 (alleging that the following conduct was "deceptive": concealing Executive Defendants' roles and ownership interests; using Promoter Defendants in an effort to manipulate the price and trading volume of the

Next, Mr. Wyatt and Mr. Smith argue only that the court should apply the agreed upon substantive law—Florida's.[421] This argument is unpersuasive since the parties did *not* initially agree upon the substantive law that should be applied, given that several Defendants argued that Florida law could not reach their conduct.[422]

Finally, SafeMoon, Mr. Karony, and Mr. Nagy argue that the only relevant factor is the third—domicile of the parties—since Plaintiffs did not allege facts supporting any of the other factors in their Amended Complaint.[423] From this, these Defendants argue Utah law applies and that Plaintiffs' FDUTPA claim should be dismissed for the additional reason that Utah law applies to this claim, and Utah does not have a similar statutory cause of action.[424] The court largely agrees.

Turning to the application of the factors in Section 145 to the FDUPTA claim, the court assumes that the injuries to Plaintiffs occurred in their states of domicile. The conduct Plaintiffs allege to be deceptive is: concealing Defendants' roles and ownership interests in SafeMoon; using Promoter Defendants to manipulate prices and trading volume; failing to disclose that the V2 Migration would result in a total loss of investors' SafeMoon tokens; and failing to disclose that Defendants could access the liquidity pools.[425] Each of these actions are attributed to SafeMoon itself and some of the Executive Defendants. Therefore, because the majority of SafeMoon entities are domiciled in Utah, the conduct causing Plaintiffs' alleged injuries largely

---

SafeMoon token; failing to disclose that the V2 migration would result in total loss of tokens; and failing to disclose that the liquidity pools were not locked).
[421] Wyatt Mot. 6–7; Smith Mot. 1–2.
[422] *See* Wyatt Mot. 9; SafeMoon Mot. 24; Nagy Mot. 22, 24; Smith Mot. 16, 18.
[423] SafeMoon COL 5–6; Nagy COL 2.
[424] SafeMoon COL 6–7.
[425] Am. Compl. ¶ 573.

emanated from Utah. The parties have different states of domicile, though SafeMoon is alleged to have its headquarters located in Utah.[426] And finally, there is no single state where the parties' relationships are centered, as the issues in the case implicate interstate transactions. Looking at the allegations of the Amended Complaint holistically, based on the factors in Section 145,[427] the alleged wrongful conduct emanated largely from Utah, while the places of alleged injury are disparate. Therefore, the court concludes that Utah is the state with the most significant relationship to Plaintiffs' unfair and deceptive trade practices claim.

Utah does not recognize a cause of action for unfair and deceptive trade practices.[428] Therefore, dismissal of this claim is appropriate. Therefore, the court does not reach the other grounds for dismissal urged by Defendants.

### D. Conspiracy

Plaintiffs' eleventh claim alleges conspiracy on the part of all defendants.[429] Several Defendants argue that Plaintiffs' failure to specify what law governs their claim is fatal.[430] The court has addressed this argument above.[431] Next, all Defendants argue that regardless, the claim fails to adequately allege the elements of conspiracy under either Utah or California law.[432] As above, the court first engages with the conflict of laws issue before turning to the other grounds for dismissal.

---

[426] Am. Compl. ¶¶ 6–27.

[427] Like the Utah Supreme Court, this court does "not find another set of factors in the Restatement to be any more helpful or applicable than those in section 145" in resolving this issue. *Waddoups*, 2002 UT 69, ¶ 18.

[428] *See supra* note 394 and accompanying text.

[429] Am. Compl. ¶ 561–65.

[430] Wyatt Mot. 15–16; Smith Mot. 18; SafeMoon Mot. 23.

[431] *See supra* Section VIII.B.

[432] Wyatt Mot. 16–18; SafeMoon Mot. 23–24; Nagy Mot. 21–22; Smith Mot. 18–20.

### 1.  Most Significant Relationship

As with the unfair and deceptive trade practices claim, the civil conspiracy claim is a tort claim[433] that is governed by Section 145 of the Restatement. Again, the relevant factors are: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."[434] And as above, given that this is not a case dealing with personal injury, or a case where the parties have an extensive relationship to consider, the court concludes that the place where the alleged conduct causing the injury occurred and the principal place of business of the Defendants are the weightiest factors. The alleged conspiracy related to the Promoter Defendants falsely promoting the SafeMoon token, concealing the identities and ownership interests of the SafeMoon leadership team, and making misleading statements to suggest Defendants were also holding their tokens, while instead, they were selling them.[435] While some of the promotions arguably emanated from California, Georgia, New York, or Wales—where Promoter Defendants reside[436]—the alleged conspiracy was centered around SafeMoon itself—and most of the SafeMoon entities are headquartered in Utah.[437] And the alleged wrongful conduct not involving Promoter Defendants more plainly took place in Utah.

Again, the court gives more weight to the place where the wrongful conduct occurred than the other Section 145 factors, given that this is not a personal injury case, and that the

---

[433] *See Waddoups*, 2002 UT 69, ¶ 17 ("Civil conspiracy is also a tort."); *Pyper v. Reil*, 2018 UT App 200, ¶ 16, 437 P.3d 493.
[434] Restatement (Second) of Conflict of Laws § 145(2).
[435] *See* Am. Compl. ¶¶ 562–63.
[436] *Id.* ¶¶ 22–26.
[437] *Id.* ¶¶ 9–15.

parties do not have any kind of lengthy relationship to consider.[438] Accordingly, Utah has the most significant relationship to this claim.

### 2. Elements of Conspiracy

Under Utah law, "the tort of civil conspiracy requires proof of five elements by clear and convincing evidence: '(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.'"[439]

The Amended Complaint alleges that Executive Defendants engaged in a conspiracy with Promoter Defendants to promote and artificially inflate the price of the SafeMoon token.[440] The predicate acts of the conspiracy are: "concealing the identity and ownership interests of" SafeMoon executives; "falsely promoting the [SafeMoon] tokens as sound investments"; and "making misleading statements" that Defendants were holding their tokens, when in fact, Defendants were selling their tokens.[441] Even assuming that the first, second, third, and fifth elements have been plausibly alleged, the fourth has not. The Amended Complaint merely alleges potentially wrongful conduct; it does not allege that that conduct is unlawful, as required by Utah law. And further, the Amended Complaint does not plausibly allege unlawful conduct on the part of each Defendant in support of this claim.

Therefore, the court dismisses Plaintiffs' eleventh claim.

---

[438] *Cf. Waddoups*, 2002 UT 69, ¶ 19.
[439] *Pyper v. Reil*, 2018 UT App 200, ¶ 16, 437 P.3d 493 (quoting *Pohl, Inc. v. Am. v. Webelhuth*, 2008 UT 89, ¶ 29, 201 P.3d 944)).
[440] Am. Compl. ¶ 562.
[441] *Id.* ¶ 563.

### E.  Unjust Enrichment

Plaintiffs' thirteenth claim is for unjust enrichment.[442] Defendants make three arguments: first, that because Plaintiffs do not allege California conduct, California law does not apply; second, that the unjust enrichment claim fails because it is not a standalone cause of action under California law; and third, that plaintiffs have not alleged that they lack an adequate remedy at law, as required by California law.[443] The court begins with a conflict of laws analysis, and in doing so, addresses Defendants' first argument.

#### 1.  Most Significant Relationship

Unjust enrichment is grounded in contract law,[444] which is typically governed by Section 188 of the Restatement. However, Section 221 of the Restatement more specifically applies to claims for restitution.[445] The factors under Section 221 are: "(a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship, (b) the place where the benefit or enrichment was received, (c) the place where the act conferring the benefit or enrichment was done, (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment."[446]

The thrust of Plaintiffs' unjust enrichment claim is that by purchasing and trading SafeMoon tokens, Plaintiffs raised the price and trading volume of SafeMoon tokens, which

---

[442] *See id.* ¶¶ 583–87.

[443] Wyatt Mot. 24; SafeMoon Mot. 25; Nagy Mot. 24–25; Smith Mot. 20–21.

[444] *See Wohnoutka v. Kelley*, 2014 UT App 154, ¶ 12, 330 P.3d 762.

[445] *See Boulder Falcon v. Brown*, No. 2:22-cv-00042-NJP-JCB, 2022 WL 10337359, at *7 (D. Utah Sept. 29, 2022).

[446] Restatement (Second) of Conflict of Laws § 221(2).

allowed Defendants to sell their own tokens at inflated prices.[447] There is no physical thing in this case, therefore the final factor is inconclusive. And the parties did not have a relationship centered in any particular state, so the first factor is inconclusive as well. Arguably, the act conferring the benefit occurred in each state in which an individual Plaintiff resided. The fourth factor likewise points to numerous different states. Thus, the court gives more weight to the second factor in this case—the place where the benefit or enrichment was received.[448] While the third factor carries some weight too, it points to multiple states and countries in this case. Therefore, Utah law applies to this claim.

## 2. Elements of Unjust Enrichment

"A claim for unjust enrichment is an action brought in restitution, and a prerequisite for recovery on an unjust enrichment theory is the absence of an enforceable contract governing the rights and obligations of the parties relating to the conduct at issue."[449] "An unjust enrichment claim has three elements: '(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.'"[450] Notably, "the facts underlying unjust enrichment claims vary greatly from case to case, and the doctrine of unjust enrichment was specifically

---

[447] Am. Compl. ¶¶ 585–86.
[448] *See* Restatement (Second) of Conflict of Laws § 221 cmt. d ("[The place where the benefit or enrichment was received] will usually be that of greatest importance with respect to most issues in situations where the claim to restitution does not stem from any relationship between the parties.").
[449] *Ashby v. Ashby*, 2010 UT 7, ¶ 14, 227 P.3d 246.
[450] *Howard*, 2013 UT App 208, ¶ 30 (quoting *Rawlings*, 2010 UT 52, ¶ 29).

developed to address situations 'that did not fit within a particular legal standard but which nonetheless merited judicial intervention.'"[451]

For starters, there is nothing in the Amended Complaint to suggest that the parties have an enforceable contract governing their rights and obligations. But regardless, the allegations in the Amended Complaint do not state a claim for unjust enrichment under Utah law. Even if Plaintiffs conferred a measurable benefit on Defendants by increasing the trading volume through their individual transactions,[452] Plaintiffs have not alleged that Defendants knew of or appreciated such a benefit.

Therefore, the court dismisses Plaintiffs' unjust enrichment claim.

### F. Conversion

Plaintiffs' eighth and ninth claims allege that SafeMoon and Mr. Karony committed conversion under California and Utah law respectively.[453] SafeMoon and Mr. Karony argue that these claims should be dismissed for two reasons: first, because neither Utah law nor California law applies; and second, because the facts allege do not establish that Plaintiffs' tokens were converted.[454] The court again begins with a conflict of laws analysis, and in doing so addresses the first argument.

### 1. Most Significant Relationship

In their initial briefing, SafeMoon and Mr. Karony argued that neither Utah law nor California law apply here. They suggest that to apply California law to their conduct would result

---

[451] *Desert Miriah, Inc. v. B & L Auto, Inc.*, 2000 UT 83, ¶ 12, 12 P.3d 580.
[452] *Cf. Advanced Recovery Sys. v. Am. Agencies*, 923 F.3d 819, 830 (10th Cir. 2019) (holding a plaintiff had failed to prove plaintiff had conferred a benefit in the form of a stock increase where the plaintiff did not present evidence of the amount the stock had increased).
[453] Am. Comp. ¶¶ 514–26.
[454] SafeMoon Mot. 21–23.

in an impermissible "extraterritorial application of California law," and argue that one of the named plaintiffs being a resident of California is insufficient.[455] Next, they suggest that in order to bring a conversion claim under Utah law, at least one of the named Plaintiffs must be a Utah resident.[456] These arguments are without merit.

Many private civil claims require a conflict of laws analysis[457]; there is simply no extraterritoriality issue in applying tort law to out-of-state conduct. And likewise, there is no requirement that a plaintiff be a resident of Utah in order to bring a claim for conversion under Utah law. SafeMoon and Mr. Karony cite cases involving class action certification,[458] which cannot properly be read to stand for the proposition that a state's tort law applies only to that state's plaintiffs. Therefore, the court turns to which state has the most significant relationship to the conversion claim.

Conversion is a tort claim,[459] governed by Section 145 of the Restatement. As above, Section 145 requires that courts look to: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."[460]

---

[455] *Id.* at 22.
[456] *Id.*
[457] *See, e.g.*, *Boulder Falcon*, 2022 WL 10337359, at *4 ("Utah applies the most significant relationship approach described in § 145 of the Restatement (Second) of Conflict of Laws when determining which state's law should apply to a tort claim, such as conversion."); *Robb v. Universal Constructors, Inc.*, 665 F.2d 998, 1000–01 (10th Cir. 1981).
[458] *Cf. Clark v. Strad Energy Servs., USA, Ltd.*, 2018 WL 3647922, *5 (D. Colo. Aug. 1, 2018); *Self v. TPUSA, Inc.*, 2009 WL 273326, *2 (D. Utah Feb. 4, 2009).
[459] *See Jones & Trevor Marketing, Inc. v. Lowry*, 2010 UT App 113, ¶ 3, 233 P.3d 538; *Boulder Falcon*, 2022 WL 10337359, * 4.
[460] Restatement (Second) of Conflict of Laws § 145(2).

Plaintiffs allege that SafeMoon and Mr. Karony committed conversion by implementing a 100% tax on the V2 migration without authorization.[461] Per the analysis with regard to the FDUTPA claim above, because this is a business tort not involving bodily injury, the more important factors are the place where the conduct causing the injury occurred and the principal place of business of the defendants.[462] Given the allegations, Plaintiffs' injuries likely occurred wherever they reside, while the conduct causing the injury likely occurred in Utah, as that is where the bulk of the SafeMoon entities are incorporated and do business and where Mr. Karony resides. Especially given that the alleged wrongful conduct was widespread and likely had nationwide—if not international—effects, the court concludes that Utah has the most significant relationship to the conversion claim.

## 2. Elements of Conversion under Utah Law

The elements of conversion under Utah law are: "'[1] an act of willful interference with property, [2] done without lawful justification, [3] by which the person entitled to property is deprived of its use and possession,' and [4] that the party 'is entitled to immediate possession of the property at the time of the alleged conversion.'"[463] SafeMoon and Mr. Karony argue that the Complaint does not allege that SafeMoon and Mr. Karony willfully interfered with property or that the V1 tokens were taken from Plaintiffs.[464]

Regarding the V2 migration, the Amended Complaint alleges that without notice or consent, SafeMoon implemented a 100% fee on "every sale, purchase, or general transfer of

---

[461] Am. Compl. ¶¶ 517, 523.
[462] *See supra* notes 414–415 and accompanying text.
[463] *Rand*, 2014 UT App 246, ¶ 11 (quoting *Jones & Trevor Mktg., Inc.*, 2010 UT App 113, ¶ 15 n.13).
[464] SafeMoon Mot. 22.

V1 . . . tokens from one wallet to another."[465] However, the Complaint does not allege that any

named Plaintiff's V1 tokens were subject to the 100% fee. Therefore, Plaintiffs have failed to

state a claim, since they do not sufficiently allege the third element—deprivation of use and

enjoyment of property—and since they lack standing to assert a conversion claim on behalf of

others who are not parties to this litigation.[466]

## ORDER

For the forgoing reasons, the following claims are dismissed without prejudice:

1. Plaintiffs' first claim under Rule 10b-5(b) for misrepresentations in connection with the
   sale of a security as against all moving Defendants;

2. Plaintiffs' second claim under Rule 10b-5(a), (c) for a scheme or artifice to defraud in
   connection with the sale of a security as against all moving Defendants;

3. Plaintiffs' third claim under Section 12(a)(1) of the Securities Act for offer or sale of an
   unregistered security as against Mr. Wyatt and Mr. Nagy;

4. Plaintiffs' fourth claim under Section 15 of the Securities Act for control person liability
   as against Mr. Nagy and Mr. Smith;

5. Plaintiffs' fifth claim under Section 20 of the Exchange Act for control person liability as
   against all moving Defendants;

6. Plaintiffs' eighth and ninth claims for conversion as against SafeMoon and Mr. Karony.

7. Plaintiffs' tenth claim for a RICO violation as against all moving Defendants;

---

[465] Am. Compl. ¶ 338 (emphasis removed).
[466] *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976))).

8.  Plaintiffs' eleventh claim for conspiracy as against all moving Defendants;

9.  Plaintiffs' twelfth claim for violation of the FDUPTA as against all moving Defendants; and

10. Plaintiffs' thirteenth claim for unjust enrichment as against all moving Defendants.

Plaintiffs may seek leave to amend their complaint within sixty days of the date of this decision and order.

Signed March 29, 2024.

BY THE COURT

_____
David Barlow
United States District Judge

76